## COMMONWEALTH vs. ROBERT L. BIANCHI, JR.

Suffolk. September 14, 2001. - November 9, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Hearsay, State of mind, Instructions to jury. *Evidence,* Hearsay, Spontaneous utterance, State of mind. *Intent. Malice. Controlled Substances.*

At a murder trial, the judge did not err in allowing witnesses to testify as to what the victim said concerning a previous assault by the defendant or to testify concerning the witnesses' own observations of the victim's demeanor and injuries after the assault, where the assault was relevant to show the hostile nature of the relationship between the defendant and the victim and to show the defendant's state of mind and his motive to kill the victim; where the victim's statements were admissible under the spontaneous exclamation exception to the hearsay rule; and where the witnesses' observations were not hearsay. [322-323]

Although the judge at a murder trial erred in admitting testimony from witnesses regarding statements made by the victim regarding her fear of the defendant after an assault by the defendant, the testimony was not prejudicial, because it was merely cumulative of properly admitted evidence and did not undermine the defense, and because evidence of the defendant's guilt was overwhelming. [323-326]

At a murder trial, the judge did not err in refusing to admit the defendant's purported suicide note into evidence, where the note could not be used to show the defendant's present state of mind because it described past conduct; where the note could not be admitted as a statement against penal interest because the defendant was available to testify; and where the note did not serve to clarify the text of other writings of the defendant that had been properly admitted, and so could not be admitted under the doctrine of verbal completeness. [326-328]

The judge at a murder trial did not err in refusing to instruct the jury on voluntary manslaughter, where the evidence of provocation was not adequate in law to cause the defendant to lose his self-control in the heat of passion. [328-329]

INDICTMENTS found and returned in the Superior Court Department on May 26, 1994.

The cases were tried before *Sandra L. Hamlin*, J., and a motion for a new trial was heard by her.

*Dana Alan Curhan* for the defendant.

*Amanda Lovell*, Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning hours of April 17, 1994, Donna Bianchi was beaten and choked with a night stick and sprayed with mace in her home by her estranged husband, Robert L. Bianchi, Jr. She became fearful that Bianchi was going to kill her and her child, and obtained an abuse prevention order against him the following day.

On May 6, 1994, Donna dropped her seven-month old son off at her sister-in-law's house on her way to work. As she left the house, Bianchi, who had been following her for several days, confronted her. She began screaming and running away from him. As he pursued her, she tripped and fell. He picked her up by the hair, prodded her in the back with a gun, and herded her toward the street where he shot her twice in the back. After she fell to the ground, paralyzed by one of the first two bullets, Bianchi placed the muzzle of the gun on her chest, and fired three more times, pausing between shots.

A jury convicted Bianchi of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. He was also convicted of violating a protective order issued pursuant to G. L. c. 209A, § 7.

Bianchi filed a timely notice of appeal which was stayed to allow him to file a motion for a new trial, later denied by the trial judge. Bianchi appealed from the denial of his motion, which has been joined with his direct appeal in this court.

Bianchi's defense was, in essence, that he lacked the requisite malice to commit murder due to a mood disorder caused by steroid abuse. On appeal he claims that the judge erred by: (1) permitting testimony about the April 17 assault; (2) permitting several witnesses to testify to statements made by the victim about her fear of Bianchi in the weeks following April 17 and prior to her murder on May 6; (3) excluding a purported suicide note written by Bianchi after the murder; and (4) failing to instruct the jury on voluntary manslaughter. Bianchi also asks

that we exercise our plenary power under G. L. c. 278, § 33E, to reduce the verdict to manslaughter or murder in the second degree.

All of the errors claimed by Bianchi were either preserved or resurrected by the trial judge in her decision on the motion for a new trial. Accordingly, we review them to determine whether any error was prejudicial. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998). For the reasons set forth below, we affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* We summarize the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. See *Commonwealth* v. *Fowler*, 431 Mass. 30, 31 (2000).

The victim began dating Bianchi when she was fifteen years old and he was twenty-two years old. They were married in 1992. She gave birth to a son in September, 1993. They struggled financially, and in February, 1994, moved to the victim's father's home in Medford. Sometime around April 10, 1994, the victim asked Bianchi to move out of the house. He moved out for a day or two, but returned even though the victim insisted that he sleep in a separate room.

At approximately 2 A.M. on April 17, 1994, Officer Caesar Delatorre of the Medford police department received a radio call instructing him to respond to the victim's address. When he arrived, he found the victim lying on the hallway floor. She was hysterical — shaking and crying — and had bruises on her neck and torso. She also had lacerations on the back of her head that were bleeding profusely. Delatorre observed blood on the floor and walls, and he smelled mace in the air.

The victim told Delatorre that Bianchi hit and choked her with a night stick and had sprayed mace at her, and that in order to stop the beating she told Bianchi that she loved him and would never leave him. Delatorre recovered the night stick and the mace canister from one of the rooms on the second floor. Bianchi was arrested and the victim was transported to a hospital where photographs of her injuries were taken. On April

19, she obtained an abuse prevention order from the Somerville District Court pursuant to G. L. c. 209A.[1]

That same day, a victim-witness advocate (advocate) was referred to the victim by the District Court. During their initial telephone conversation, the victim told the advocate that she was terrified of Bianchi and that there was no doubt in her mind that he would kill her. On April 22, 1994, the advocate met with the victim and saw the bruises on her neck and torso. The victim described Bianchi as jealous, suspicious, and controlling. She reiterated her fear that Bianchi would kill her.

On April 26, Officer Matthew Insogna received a call to go to the victim's home. Insogna approached the front of the house and he saw the victim standing in the doorway with her son in her arms and tears in her eyes. She told Insogna that she was afraid Bianchi was near her home and was going to kill her, and that she also feared for her son's life. She asked Insogna to walk her to her automobile, and as they began down the walkway, she stayed so close to him that she was touching the back of his body and he could feel her shaking. Once she was inside her vehicle, she asked Insogna to follow her to the main street, which he did.

On April 27, Officers Paul Covino and John Zifaris were instructed to go to the victim's home so that Bianchi could collect his belongings. The victim described the April 17 incident to Covino and said that she was afraid that Bianchi would assault her again. When Bianchi arrived at the house, the officers explained to him that the protective order was in place and he responded that he understood.

On April 28, the victim met with the advocate for a second time and repeated her fear that Bianchi was going to kill her. She also told the advocate that when Bianchi came to her house to collect his belongings, he had taken a pair of her underwear, as well as a used condom from the trash.[2] The victim interpreted this conduct as a threat.

On May 5, the victim spoke with the advocate for the last

---

[1]The order directed Bianchi not to abuse the victim, not to contact her, to leave and stay away from her residence, to stay away from her workplace, and to surrender custody of their son.

[2]These items were found in Bianchi's van after his arrest for the murder.

time. She told the advocate that she and Bianchi had gone to court and Bianchi had been awarded visitation rights with their son. The victim again stated that she feared Bianchi was going to kill her.

On the morning of May 6, the victim brought her son to her sister-in-law's house. They talked for ten or fifteen minutes and discussed the fact that Bianchi was scheduled to visit the baby around 11 A.M. The victim told her sister-in-law that she was afraid that Bianchi would kidnap her son and try to kill her. She then left the house to go to work.

As the sister-in-law was taking the baby's sweater and hat off, she heard screaming outside, as did her next door neighbor. When the neighbor went to the window, she saw two adults facing each other in the backyard. She initially turned away from the window, but when the tone of the screaming changed, she ran back and saw the victim trying to run away but tripping on tree stumps and old chicken wire that were along the side of the house. The victim appeared desperate and was screaming, "[N]o, no, please, no."

She also saw Bianchi following behind the victim, holding her by the hair and prodding her in the back with a gun. He appeared to be calm, composed, and determined. The neighbor started to scream as Bianchi herded the victim back toward the street, and she then telephoned 911. As she dialed, she heard a shot. She looked back out the window and saw the victim lying on her back on the sidewalk. The defendant knelt over her and looked directly in her face. The sister-in-law came out of her house and yelled to Bianchi to leave the victim alone. Bianchi looked over, made eye contact with the sister-in-law, and then turned back and shot the victim three more times at point blank range,[3] taking his time in between shots. After the shooting, Bianchi drove away in a white Budget rental van.

At 4 P.M. that same day, a police officer in Elizabeth, New Jersey, and his partner received a radio call and responded to a gasoline station where they saw Bianchi's rental van. Bianchi was vomiting into a barrel. He told the officers that he had killed his wife. He also told the officers that he was sick and

---

[3]The medical examiner testified that the victim was shot five times, the first two in the back, one of which would have paralyzed her.

needed help.[4] An ambulance took Bianchi to a hospital. The officers recovered Bianchi's gun concealed in the bathroom of the gasoline station.

At trial, Bianchi asserted that his conduct in April and May, 1994, was the result of his use of steroids. He testified that he started using steroids in 1988 to help improve as a competitive power weight lifter. The steroids increased his strength and aggressiveness, but made him "excitable," increased his appetite, and disturbed his sleep. In July, 1988, he received medical treatment at Lemuel Shattuck Hospital after complaining of side effects of steroid use, but following his release from the hospital he continued using steroids.

In late 1992, Bianchi stopped using steroids while he and the victim were trying to conceive a child, but he resumed using them in January, 1993, and consistently increased the doses and types of steroids that he took, which caused him to become "a little wild eyed," develop a "huffy attitude," feel depressed, and experience a change in his eating and sleeping habits. He testified that by the end of 1993, he weighed over 300 pounds[5] and was capable of "bench pressing" 465 pounds; that in early 1994, he increased his use of steroids to the point where he had tripled his dosage; and that this increase caused him to become increasingly paranoid, depressed, and suicidal. His mood became "like a roller coaster."

Bianchi offered expert testimony about the effects of steroid use on his state of mind, and, in particular, that in April and May, 1994, he suffered from a "substance-induced mood disorder."[6] The expert based his opinion on Bianchi's self-reports of his steroid use, including a chart Bianchi had created from memory almost one year after the killing, which chart purported to document his steroid use during 1994, and on nine hours of interviews, during which Bianchi described his steroid use and his moods. The expert did not conduct a physical

[4]Bianchi told an emergency medical technician that he had tried to commit suicide by taking 150 aspirin.

[5]The victim weighed approximately 130 pounds in 1994.

[6]On cross-examination, the expert testified only that it was "probable" that Bianchi's reported steroid use "may have affected his mood," but could not render an opinion that the steroid use definitely affected his mood.

examination of Bianchi or interview anyone who knew him at the time of the killing. The expert admitted that one of the dangers of relying on self-reports of steroid use is that such reports are open to selective and biased recall.

2. *Evidence of the April 17 assault.* Bianchi argues that the judge erred in allowing witnesses to testify about the April 17 assault because the testimony was unduly prejudicial and largely hearsay. The jury heard two types of testimony about the April 17 incident: testimony recounting what the victim said about the assault, and testimony from witnesses describing their observations of the victim's demeanor and injuries after the assault. Evidence of the assault was relevant and both types of evidence were properly admitted.[7]

The April 17 assault was relevant to show the hostile nature of the relationship between Bianchi and the victim. See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 512 n.6 (1997), *S.C.*, 433 Mass. 439 (2001); *Commonwealth* v. *Andrade*, 422 Mass. 236, 239-240 (1996); *Commonwealth* v. *Gil*, 393 Mass. 204, 215-217 (1984).[8] It was also relevant evidence of Bianchi's state of mind and motive to kill the victim. *Commonwealth* v. *Todd*, 394 Mass. 791, 798 (1985), and cases cited.[9]

The victim's statements about the April 17 incident were admissible under the spontaneous exclamation exception to the hearsay rule. Immediately after the April 17 incident, while she was shaking, crying, and bleeding, the victim told Officer Dela-

---

[7]The judge gave the jury limiting instructions relating to the April 17 incident several times during trial: "[Y]ou may consider it solely on the limited issue as you may find it relates to motive and/or state of mind of the defendant"; "you may consider it on limited issues as you find they may reflect on the defendant's motive, his state of mind on the issue of malice and deliberate premeditation if you find it to be relevant."

[8]See also *Commonwealth* v. *Magraw*, 426 Mass. 589, 599 (1998) (evidence that victim found defendant's rifle on her bed properly admitted "to show discord between the defendant and the victim in the face of the defendant's claim that he and the victim 'were so happy'"); *Commonwealth* v. *Haley*, 363 Mass. 513, 524 (1973), *S.C.*, 413 Mass. 770 (1992) (evidence not offered to show bad character of defendant but to show intensity of discord between him and his wife).

[9]See also *Commonwealth* v. *Squailia*, 429 Mass. 101, 105 (1999) (prior bad act evidence properly admitted, within judge's discretion, to show defendant's intent or state of mind); *Commonwealth* v. *Arce*, 426 Mass. 601, 602 (1998) (evidence of hostile relationship admissible to show motive to kill).

torre that Bianchi had hit her and choked her with the night stick and sprayed mace at her. When the victim's sister-in-law arrived at the emergency room shortly thereafter, the victim said, "I can't believe [Bianchi] did this to me. He's never done anything like this to me before." She also told her sister-in-law that she believed that Bianchi was trying to kill her. These statements were made "while the victim remained in pain and emotional distress." *Commonwealth* v. *Tevlin*, 433 Mass. 305, 319 (2001). There was no evidence that the victim had been influenced by factors other than the trauma of the event. Accordingly, the statements that the victim made immediately after the April 17 incident were properly admitted in evidence as spontaneous exclamations.

The testimony of witnesses concerning the victim's demeanor and injuries after the April 17 assault were also admissible. Officer Delatorre, the first officer to respond to the victim's home, noticed the injuries to the victim's head, neck, and torso. At the emergency room immediately after the April 17 incident, the victim's sister-in-law saw that the victim was "bruised from her head to her feet," and she saw blood on the pillow and bruises and cuts on the victim's neck, shoulder blades, chest, and arms.[10] This testimony was not hearsay and was properly admitted. P.J. Liacos, Massachusetts Evidence § 8.1, at 463 n.2 (7th ed. 1999).

The determination by the judge that evidence regarding the April 17 assault was more probative than prejudicial is a determination left to her sound discretion. *Commonwealth* v. *Cyr*, 425 Mass. 89, 95-96 (1997), *S.C.*, 433 Mass. 617 (2001). On the record before us, we do not find that she abused that discretion in admitting the evidence, and therefore find no error.

3. *Evidence of the victim's fear.* Bianchi next argues that the judge erred in allowing witnesses to testify about the victim's fear after the April 17 assault.[11] Bianchi contends that this evidence strongly undermined his theory of defense that the

---

[10]The jury also saw photographs of the victim's injuries.

[11]The victim's brother testified: "She knew that [Bianchi] was going to kill her if he found her" and that "[s]he was scared to death." The sister-in-law described several conversations in which the victim said that she feared that Bianchi was going to kill her and kidnap the baby. Officer Insogna described a conversation with the victim on April 26 in which she said that she feared that Bianchi would kill her and the baby. Officer Covino described a conversation

killing resulted from a sudden loss of control brought on by his steroid use. The Commonwealth concedes that the victim's statements that she was afraid Bianchi was going to kill her should not have been admitted. "The question, then, becomes whether the error caused prejudice to the defendant, requiring reversal of the verdict." *Commonwealth* v. *Andrade, supra* at 239. The erroneous admission of hearsay testimony is not prejudicial where it is merely cumulative of properly admitted evidence, does not undermine the defense, and where the evidence of the defendant's guilt is overwhelming. *Commonwealth* v. *Johnson*, 429 Mass. 745, 749-750 (1999).

We have reviewed the entire record and conclude that the evidence of the victim's fear was merely cumulative of properly admitted evidence in this case from which the jury would inevitably infer that the victim was afraid of Bianchi. See *Commonwealth* v. *Andrade, supra* at 240. See also *Commonwealth* v. *Jenner*, 426 Mass. 163, 165 (1997). The jury properly heard descriptions and saw photographs of the victim's injuries from the April 17 incident. They learned that the victim obtained a protective order against Bianchi. They also properly heard Officer Insogna testify that the victim was shaking when he walked her to her car on April 26, and that on April 27, while Officer Covino waited in the victim's home for Bianchi to gather his belongings, he noticed the victim's frightened demeanor.

The testimony also did not undermine Bianchi's defense that increased steroid use had had an impact on his mood and impulse control, negating malice. Bianchi and his expert testified that the deleterious effects of steroid abuse changed Bianchi's mood and behavior during the period in which both assaults on the victim occurred. That the victim began to fear for her life after the brutal assault on April 17 is not inconsistent with Bianchi's assertion that he was losing control and his mood was like a "roller coaster" during this same period. Indeed, evidence that the victim told both her sister-in-law and the advocate that before April 17 Bianchi had never been physi-

---

with the victim on April 27 in which she described the April 17 incident and said that she feared it would happen again. The advocate testified about conversations she had with the victim on April 19, April 22, and May 5, during which the victim said that she was terrified of Bianchi, that he had threatened her, and that she had no doubt that he would kill her.

cally violent toward her tended to support the theory of the defense, and was so characterized by defense counsel in his closing argument.

This case is distinguishable from *Commonwealth* v. *Cyr, supra,* where we found that hearsay evidence admitted to show that the victim feared her assailant prior to the murder both undermined the defense of provocation and was prejudicial to the defendant. In that case, the improper evidence was not cumulative of properly admitted evidence. *Id.* at 94. In this case, unlike in *Cyr,* the evidence negating provocation and loss of control included the testimony of eyewitnesses to the murder that Bianchi was careful, calm, and composed during the shooting. Finally, the evidence of the victim's fear was not inconsistent with the defense, as we held in *Cyr,* because the victim's fear did not predate the period during which, Bianchi asserts, he was not in control of himself as the result of steroid use.

The evidence that Bianchi planned the murder was overwhelming. There was also substantial evidence that undermined the defense, unrelated to any testimony about the victim's fear. The evidence of planning began with Bianchi's trip to Maine on May 1 to purchase a gun that he would not be required to register in Massachusetts. There was evidence that Bianchi telephoned three rental companies to obtain information about the availability and price of different vans, and that when he rented the van on May 3, he scheduled its return on May 7, the day after the murder. The contents of the van on the day of the murder also provided evidence of planning. When the police searched the van, they found notes in Bianchi's handwriting about the victim's daily habits, a flashlight, wire, duct tape, a knife, "nunchucks," and binoculars. Although Bianchi testified that he rented the van to take photographs of the victim with another man to use in the divorce and custody proceedings, no camera was found in the van.

In contrast to the strength of the evidence of premeditation, Bianchi's defense of steroid use was substantially undermined by his own testimony and that of his expert. Bianchi provided inconsistent descriptions of his steroid use. After his arrest, he told a Massachusetts State trooper that he had not used steroids

for six months before the murder, but at a later date, he told a doctor that he had not used steroids for six weeks before the murder. Almost one year after that, he told his expert that he was "tapering" down his steroid use in May, 1994. Bianchi's expert testified that these inconsistencies raised questions regarding the credibility of his self-reports. Moreover, Bianchi testified that he was spending approximately $1,000 a week on steroids in 1994, even though he had lost his job in December, 1993, and he and the victim were struggling financially.

Bianchi's expert testimony did not bolster his defense. His expert testified that there are certain physical characteristics that are indicative of steroid use,[12] but that he did not conduct a physical examination of Bianchi and did not know whether such characteristics were present. He also testified that the New Jersey hospital records indicated that Bianchi's blood pressure was normal on May 6, 1994, and that a February, 1993, testicular examination was also normal, both of which would be inconsistent with steroid abuse. Although the expert testified that Bianchi suffered from a "substance-induced mood disorder" in April and May, 1994, which may have caused him to become "hypomanic," he could not conclusively link Bianchi's steroid use with a loss of control or an inability to reason, understand, or plan, explaining only that: "[W]hen people are in a hypomanic state, they are often much more irritable, much more impulsive . . . . Impulsivity means you act without much contemplation. They tend to be more impulsive, and they tend to be maybe more aggressive."

In the circumstances of this case, the error in admitting hearsay evidence of the victim's fear was not prejudicial.

4. *Excluded suicide note.* When the police officers searched Bianchi's van, they found a pad of blue-lined, letter-sized paper. The judge allowed the Commonwealth to introduce the first two pages from the pad, which contained Bianchi's handwritten notes about his search for a rental van and information about the victim's health insurance, credit cards, payroll checks, and

---

[12]These characteristics include an increase in lean muscle mass, gynecomastia (occurrence of female-like breast tissue in males), male pattern baldness, acne, stretch marks around the muscles, high blood pressure, and testicular atrophy.

schedule. Bianchi wrote these two pages around April 28 or April 29.[13] Also written on the blue-lined pad were a second set of pages containing a purported suicide note that Bianchi apparently wrote after the May 6 murder.[14] The judge denied on hearsay grounds Bianchi's requests to admit these latter pages. There was no error.

Bianchi contends that these two pages were admissible because they were relevant to his state of mind at the time of the killing.[15] However, a suicide note purporting to explain past conduct is not admissible under the state of mind exception to the hearsay rule. See *Commonwealth* v. *Pope*, 397 Mass. 275, 281 (1986). The pages were not admissible under the penal interest exception to the hearsay rule, because Bianchi was available to testify. See *Commonwealth* v. *Charles*, 428 Mass. 672, 677-678 (1999).[16] Finally, the pages were not admissible under the doctrine of verbal completeness,[17] because they are not the same statement or writing as the two pages admitted in

---

[13]Bianchi does not challenge the admission of these two pages.

[14]Although the record does not indicate precisely when Bianchi wrote the second set of blue pages, the context indicates they were written after the victim was already dead:

> "I've lost all hope and took it out on her, the one I love most. I can't bear being away from her[.] . . . I can't live with myself any longer[.] What have I done[.] God have mercy on me. Donna please forgive me. . . . My only wish is that we be buried together for the sake of my son. Please tell him we went in an accident. If he finds out he [*sic*] be like me."

[15]In support of this argument, Bianchi cites *Commonwealth* v. *Fernandes*, 427 Mass. 90, 94 (1998), where we examined a declarant's threat to "get" or kill someone, and found it to be admissible "to show that the declarant had a particular state of mind and that he carried out his intent." *Id.* at 95.

[16]"A statement is admissible under the penal interest exception if (1) the declarant's testimony is unavailable; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its trustworthiness." *Commonwealth* v. *Charles*, 428 Mass. 672, 677 (1999).

[17]See *Commonwealth* v. *Carmona*, 428 Mass. 268, 271-272 (1998), quoting *Commonwealth* v. *Robles*, 423 Mass. 62, 69 (1996) ("When a party introduces a portion of a statement or writing in evidence the doctrine of verbal completeness allows admission of other relevant portions of the same statement or

evidence. The only relationship between the pages was that the paper was from the same pad. The second set of pages does not in any way "clarify the context" of the first set of pages. Accordingly, they are not admissible under the doctrine of verbal completeness. *Commonwealth* v. *Carmona*, 428 Mass. 268, 272 (1998), quoting *Commonwealth* v. *Robles*, 423 Mass. 62, 69 (1996).

5. *Manslaughter instruction.* Bianchi contends that the judge erred in refusing to instruct the jury on voluntary manslaughter, given that he testified that he and the victim were involved in a heated argument on May 6 during which the victim punched Bianchi in the face and swore at him, thus raising the issues of adequate and reasonable provocation and sudden combat.

"In deciding whether the judge should have charged on manslaughter, we assume the version of the facts most favorable to the defendant." *Commonwealth* v. *Rosado*, 434 Mass. 197, 204, cert. denied, 122 S. Ct. 372·(2001), quoting *Commonwealth* v. *Maskell*, 403 Mass. 111, 116 (1988). Even if there is evidence of hostile verbal or physical interaction between the parties preceding the killing, a manslaughter instruction is not required unless the evidence of provocation is deemed adequate in law "to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Pierce*, 419 Mass. 28, 31 (1994), quoting *Commonwealth* v. *Halbert*, 410 Mass. 534, 538 (1991). "A jury must be able to infer that a reasonable person would have become sufficiently provoked, and that the defendant was in fact provoked" in order to warrant a manslaughter instruction. *Commonwealth* v. *Pierce, supra.* In other words, "[t]here must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980).

---

writing which serve to 'clarify the context' of the admitted portion . . . . The rule prevents a party from presenting a fragmented and misleading version of events to the finder of fact.")

The evidence here was inadequate as a matter of law to constitute provocation. Even though Bianchi testified that immediately before shooting the victim she told him that there had always been someone else in her life and called him a "fucking prick," insults and quarreling alone do not provide reasonable provocation. See *Commonwealth* v. *Masello*, 428 Mass. 446, 449 (1998), and cases cited. Moreover, his testimony that he had suspected the victim was seeing someone else well before he confronted her on May 6,[18] and that while her words "upset" him, he "wasn't mad or anything," belies any argument that he acted in the heat of passion, or that the shooting was the product of this alleged provocation. Bianchi's further testimony that the victim punched him in the face during their "argument" adds little to his claim of provocation, where he intentionally precipitated the confrontation in violation of the protective order, was a weightlifter who outweighed the victim by more than 170 pounds, and was armed with a fully loaded weapon. *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973), *S.C.*, 391 Mass. 123 (1984) (victim's scratching defendant's face insufficient to warrant manslaughter instruction).[19] On this state of the evidence, a reasonable jury could not have found that "a reasonable person would have become sufficiently provoked, and that the defendant was in fact provoked" by the victim's conduct. *Commonwealth* v. *Pierce*, *supra* at 31.

6. *Section 33E.* Bianchi argues that pursuant to G. L. c. 278, § 33E, we should reduce the murder verdict because there is

[18]Among other things, when he went to the victim's home on April 27 to collect his belongings, Bianchi found a used condom in the victim's trash can. He took the condom, along with a pair of the victim's soiled underpants, as proof that the victim had been unfaithful to him. In addition, Bianchi testified that he had been secretly following the victim for several days in his rental van to get a photograph of her and "this gentlemen" for use in divorce and custody proceedings.

[19]See *Commonwealth* v. *Parker*, 402 Mass. 333, 344 (1988), *S.C.*, 412 Mass. 353 (1992), and 420 Mass. 242 (1995) (although defendant testified that victim struck him twice, no reasonable jury could have accepted suggestion that he was provoked into brutal killing). See also *Commonwealth* v. *Curtis*, 417 Mass. 619, 629 (1994) (attempt by victim to strike defendant with bottle of liquor inadequate provocation); *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313-314 (1987) (scratches to face of male attacker by female victim inadequate); *Commonwealth* v. *Brown*, 387 Mass. 220, 227 (1982) (evidence that victim choked defendant with shirt insufficient).

reason to doubt that Bianchi acted with deliberate premeditation or malice. After reviewing the entire record of the case, we decline to do so.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*