COMMONWEALTH vs. GEORGE A. SCHNOPPS.

Berkshire.   October 5, 1983. — January 9, 1984.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide.   Practice, Criminal,* Capital case.

This court declined to exercise its power under G. L. c. 278, § 33E, to order a new trial for a defendant convicted of murder in the first degree or to direct the entry of a lesser verdict of guilt where there was evidence tending to show that the shooting of the defendant's wife was not the spontaneous result of a quarrel but rather the result of his deliberately premeditated plan to murder her. [726-728]

INDICTMENT found and returned in the Superior Court Department on October 29, 1979.

Following review by this court, 383 Mass. 178 (1981), the case was retried before *Hayer,* J.

*John F. Rogers* for the defendant.

*Francis X. Spina,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. At a retrial, the defendant, George A. Schnopps, again was convicted of murder in the first degree. See *Commonwealth* v. *Schnopps,* 383 Mass. 178 (1981). On appeal, Schnopps's sole argument is that we should exercise our power under G. L. c. 278, § 33E, to grant him a new trial or to direct the entry of a verdict of a lesser degree of guilt. We conclude that we should not exercise our power in favor of the defendant. We affirm.

We summarize the facts. On October 13, 1979, the defendant fatally shot his wife of fourteen years. The victim and the defendant began having marital problems approximately six months earlier when Schnopps became suspicious that his wife was seeing another man. Schnopps and his wife argued during this period over his suspicion that she

had a relationship with a particular man, whom the defendant regarded as a "bum." On a few occasions the defendant threatened to harm his wife with scissors, with a knife, with a shotgun, and with a plastic pistol. A few days prior to the slaying, Schnopps threatened to make his wife suffer as "she had never suffered before." However, there is no evidence that Schnopps physically harmed the victim prior to October 13.

Three weeks before the slaying, Schnopps telephoned his home using the signal he believed the other man had been using to call the victim. His wife answered the telephone and said, "Hello, Lover." When Schnopps identified himself, his wife hung up the telephone. On that day she moved to her mother's home and took their three children with her.[1]

On October 12, 1979, while at work, the defendant asked a coworker to buy him a gun. He told the coworker he had been receiving threatening telephone calls. After work, Schnopps and the coworker went to Pownal, Vermont, where the coworker purchased a .22 caliber pistol and a box of ammunition for the defendant. The defendant purchased a starter pistol to scare the caller if there was an attempted break-in. The defendant stated he wanted to protect himself and his son, who had moved back with him.

The defendant and his coworker had some drinks at a Vermont bar. The coworker instructed the defendant in the use of the .22 caliber pistol. The defendant paid his coworker for the gun and the ammunition. While at the bar the defendant told the coworker that he was "mad enough to kill." The coworker asked the defendant "if he was going to get in any trouble with the gun." Schnopps replied that "a bullet was too good for her, he would choke her to death."

On the day of the slaying, the defendant told a neighbor he was going to call his wife and have her come down to pick up some things. He said he was thinking of letting his wife have the apartment. This was the first time the defendant indicated he might leave the apartment. He asked

---

[1] The children were two daughters, age thirteen and age four, and a son, age eleven. On October 6, the son returned to his father's home.

the neighbor to keep the youngest child with her if his wife brought her so he could talk with his wife.

Shortly before 3 P.M., the defendant called a neighbor and said he had shot his wife and also had tried to kill himself. The defendant told the first person to arrive at his apartment that he shot his wife "because of what she had done to him."

Neighbors notified the police of the slaying. On their arrival, the defendant asked an officer to check to see if his wife had died. The officer told him that she had, and he replied, "[G]ood." A police officer took the defendant to a hospital for treatment of his wounds. The officer had known the defendant for twenty-nine years. The defendant said to the officer that he would not hurt a fly. The officer advised Schnopps not to say anything until he spoke with a lawyer. The defendant then said, "The devil made me do it." The officer repeated his warning at least three times. The defendant said that he "loved [his] wife and [his] children." He added, "Just between you and I, . . . I did it because she was cheating on me."

The defendant gave a statement to the police. He said that, when he spoke to his wife, he wanted to keep the family together. His wife replied, "I've got something bigger and better than you'll ever be." Pointing to her crotch, she said, "You'll never get into this again. . . . [You] are never going to touch me again." [2] The defendant said that these words "cracked" him. He explained that everything went "around" in his head, that he saw "stars." He went "toward the guns in the dining room." He asked his wife, "[Why] don't you try" (to salvage the marriage). He told her, "I have nothing more to live for," but she replied, "Never, I am never coming back to you." The victim jumped up to leave and the defendant shot her. He was seated at that

[2] At the first trial, Schnopps claimed that on hearing these words his mind went blank and that he went "berserk." He went to a cabinet and took out the pistol he had bought and loaded the day before and shot his wife and himself. See *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981). Schnopps did not testify at the second trial.

time. He told her she would never love anyone else. After shooting the victim, the defendant said, "I want to go with you," and he shot himself.

The victim died of three gunshot wounds, to the heart and lungs. Ballistic evidence indicated that the gun was fired within two to four feet of the victim. The evidence also indicated that one shot had been fired while the victim was on the floor.

The defense offered evidence from friends and coworkers who noticed a deterioration in the defendant's physical and emotional health after the victim had left the defendant. The defendant wept at work and at home; he did not eat or sleep well; he was distracted and agitated. On two occasions, he was taken home early by supervisors because of emotional upset and agitation. He was drinking. The defendant was diagnosed at a local hospital as suffering from a "severe anxiety state." He was given Valium. The defendant claimed he was receiving threatening telephone calls.

The defendant and the Commonwealth each offered expert testimony on the issue of criminal responsibility. The defendant's expert claimed the defendant was suffering from a "major affective disorder, a major depression," a "psychotic condition," at the time of the slaying. The expert was of the opinion the defendant was not criminally responsible. The Commonwealth's expert claimed that the defendant's depression was a grief reaction, a reaction generally associated with death. The expert was of the opinion the defendant was grieving, over the breakup of his marriage, but that he was criminally responsible.

The judge instructed the jurors on every possible verdict available on the evidence.[3] On appeal, the defendant "does not now quarrel with that range of possible verdicts nor with the instruction which the trial court gave to the jury . . . . [Nor] does . . . [the defendant] now dispute that

---

[3] The jurors were told they could return a verdict of murder in the first degree on the ground of deliberately premeditated malice aforethought; murder in the second degree; manslaughter; not guilty by reason of insanity; or not guilty.

there may be some view of . . . some of the evidence which might support the verdict returned in this matter." Rather, the defendant claims that his case is "not of the nature that judges and juries, in weighing evidence, ordinarily equate with murder in the first degree." *Commonwealth* v. *Williams*, 364 Mass. 145, 152 (1973). Cf. *Commonwealth* v. *O'Brien*, 377 Mass. 772 (1979). The defendant therefore concludes that this is an appropriate case in which to exercise our power under G. L. c. 278, § 33E. We do not agree.

Pursuant to G. L. c. 278, § 33E, we consider whether the verdict of murder in the first degree was against the weight of the evidence, considered in a large or nontechnical sense. *Commonwealth* v. *Bowman*, 373 Mass. 760, 765 (1977). Our power under § 33E is to be used with restraint. *Commonwealth* v. *MacDonald*, 371 Mass. 600, 604 (1976). Moreover, "[w]e do not sit as a second jury to pass anew on the question of the defendant's guilt." *Commonwealth* v. *Reddick*, 372 Mass. 460, 464 (1977).

The defendant argues that the evidence as a whole demonstrates that his wife was the emotional aggressor, and that her conduct shattered him and destroyed him as a husband and a father. The defendant points to the fact that he was not a hoodlum or gangster, that he had no prior criminal record, and that he had a "good relationship" with his wife prior to the last six months of their marriage. The defendant concludes these factors should be sufficient to entitle him to a new trial or the entry of a verdict of a lesser degree of guilt.[4]

---

[4] The defendant suggests that if the Model Penal Code § 210.3 (1) (b) (Official Draft 1980) were the law of this Commonwealth, then this homicide conviction would be manslaughter. Section 210.3 (1) (b) reads as follows: "(1) Criminal homicide constitutes manslaughter when . . . (b) a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be." The short answer is that the Model Penal Code is not the law of the Commonwealth. While the Model Penal Code may do "a far better job than our current statutes," see *Commonwealth* v. *Starling*, 382 Mass. 423, 431 (1981) (Kap-

The Commonwealth argues that the evidence is more than ample to sustain the verdict. The Commonwealth points out that at the time of the killing there was not a good relationship between the parties; that the defendant had threatened to harm his wife physically on several occasions; and that he had threatened to kill his wife. The defendant obtained a gun and ammunition the day before the killing. The defendant arranged to have his younger child cared for by a neighbor when his wife came to see him. The jury could have found that Schnopps lured his wife to the apartment by suggesting that he might leave and let her live in it with the children. The evidence permits a finding that the killing occurred within a few minutes of the victim's arrival at the defendant's apartment and before she had time to take off her jacket. From the facts, the jury could infer that the defendant had planned to kill his wife on October 13, and that the killing was not the spontaneous result of the quarrel but was the result of a deliberately premeditated plan to murder his wife almost as soon as she arrived.

Ballistic evidence indicated that as the victim was lying on the floor, a third bullet was fired into her. From the number of wounds, the type of weapon used, as well as the effort made to procure the weapon, the jurors could find that the defendant had "a conscious and fixed purpose to kill continuing for a length of time." *Commonwealth* v. *Bonomi*, 335 Mass. 327, 356 (1957).

If conflicting inferences are possible, "it is for the jury to determine where the truth lies." *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978). There was ample evidence which suggested the jurors' conclusion that the defendant acted with deliberately premeditated malice aforethought.[5]

---

lan, J., concurring), revision of criminal statutes is for the Legislature, not this court. Lastly, it is the jurors, not the court, who determine the reasonableness of the explanation. We note that two different juries have returned verdicts of murder in the first degree against Schnopps.

[5] On appeal, the defendant complains that the prosecutor's summation, which stressed that premeditated murder requires "a thought and an act," could have confused the jurors by suggesting that if "at any time earlier

The defendant's domestic difficulties were fully explored before the jury. The jurors rejected the defendant's claim that his domestic difficulties were an adequate ground to return a verdict of a lesser degree of guilt. The degree of guilt, of course, is a jury determination. See G. L. c. 265, § 2. The evidence supports a conclusion that the defendant, angered by his wife's conduct, shot her with deliberately premeditated malice aforethought. The jurors were in the best position to determine whether the domestic difficulties were so egregious as to require a verdict of a lesser degree of guilt. We conclude, on review of the record as a whole, that there is no reason for us to order a new trial or direct the entry of a lesser verdict.

*Judgment affirmed.*

---

[the defendant] merely thought about killing that person," that was sufficient to constitute deliberately "premeditated malice aforethought." We do not read the prosecutor's argument as suggesting that conclusion. The prosecutor focused on the Commonwealth's evidence of deliberately premeditated malice aforethought throughout his argument. There was no error. In any event, the argument, read as a whole, does not create a "substantial likelihood of a miscarriage of justice." G. L. c. 278, § 33E.