## COMMONWEALTH vs. CARL E. VATCHER.

Essex. November 8, 2002. - January 28, 2003.

Present: MARSHALL, C.J., GREANEY, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Capital case.

At a murder trial, the judge did not err in denying the defendant's request for
a voluntary manslaughter instruction, where the evidence did not show an
adequate, reasonable provocation, and where under no view of the evidence
could a rational jury have validly returned a voluntary manslaughter verdict
[587-590]; further, this court declined to exercise its extraordinary power
under G. L. c. 278, § 33E, to reduce the jury verdict from murder in the
first degree to voluntary manslaughter or, alternatively, to murder in the
second degree [590-591].

INDICTMENT found and returned in the Superior Court Depart-
ment on July 1, 1999.

The case was tried before *Isaac Borenstein, J.*

*Carol A. Donovan,* Committee for Public Counsel Services,
for the defendant.

*Marcia H. Slingerland,* Assistant District Attorney (*Gerald P.
Shea,* Assistant District Attorney, with her) for the
Commonwealth.

MARSHALL, C.J. On June 21, 1999, the defendant, Carl E.
Vatcher, fatally shot his eleven year old son, James. A Superior
Court jury convicted him of murder in the first degree on a
theory of deliberate premeditation. The defendant does not
contest that the evidence supports the jury's verdict. Rather, on
appeal, he argues that the trial judge's denial of his request for
a voluntary manslaughter instruction was reversible error. The
defendant also asks that we exercise our power under G. L.
c. 278, § 33E, to reduce the verdict to voluntary manslaughter
or, alternatively, to murder in the second degree. We decline to
reduce the verdict and affirm the conviction.

1. Viewed in a light most favorable to the Commonwealth,

the facts are as follows. On the morning of the shooting James's mother left for work shortly before 8 A.M., leaving the defendant and James alone together. James had a number of physical and developmental disorders, including hypotonia[1] and attention deficit disorder. He was a third grader who participated in a special needs program, could not read, bathe himself, or tie his shoes, and had some difficulty climbing stairs and walking. At trial, James's teachers described him as a "very easy going, lovable child" who got along well with other children at school. He "enjoyed being with people and people enjoyed being with him."

Some time after James's mother left for work, an argument erupted between father and son, the details of which we reserve for later discussion. The argument escalated, culminating with the defendant firing one shot from a bolt-action .22 caliber rifle into James's abdomen.[2] James said, "You shot me, it hurts." The child tried to run upstairs, but the defendant caught him. The defendant later told police that he "wanted [his son] to die quick," and so, as James "wheez[ed]," "gasp[ed]," and "struggl[ed]," the defendant tried to cover his son's nose and mouth with his hand. When that "wasn't working," the defendant took a shoelace from a boot and wrapped it around his son's neck.[3] As James was dying, the defendant "kept telling him how he was going to heaven and that no one was going to kick him or yell at him anymore."[4]

After the shooting, the defendant covered James's body with

[1]James's mother testified that "hypotonia" is a condition that causes low muscle tone throughout the body.

[2]The defendant acquired the rifle in May, 1999, in exchange for a semiautomatic rifle he had purchased in March, 1999. The defendant was not known to his family or his neighbors to be interested in guns or hunting or to own a gun.

[3]The evidence at trial was that the defendant was over one foot taller than James and more than double his weight.

[4]In various statements introduced at trial, the defendant stated that he had not wanted a child, that he considered James "an intrusion" into his married life, and that he did not believe he was or could be a good father. Evidence at trial showed that James had been the frequent target of his mother's verbal abuse and his father's physical abuse. Over the years, the defendant had banged James's head on the floor, struck James in the chest, and hit James's head against the bathroom door. The defendant told police that on one occasion he had hit James so hard that he, the defendant, broke his own finger. In

trash bags and blankets and left the body in the cellar. The defendant left the house around 2 P.M. after unsuccessfully trying to asphyxiate himself.[5] James's mother returned home at about 4 P.M. When she discovered and began to play an audiotape recording in which the defendant admitted to killing James, she telephoned the police.[6]

When officers arrived, James's mother directed them to the audiotape recording, which they played in full. Among other things, the defendant admitted that he "bought a rifle and [he] shot [James]," then "strangled him cuz he wasn't dead." He stated that James's body was in the basement. The defendant explained that, "I was gonna do this a long time ago, but I kept putting it off. I couldn't put it off anymore. . . . All I wanted was a normal kid, an average kid, but no, I didn't get that." He also stated, "[T]he only way I could've done this is if I lost control and I did. I lost control this morning."[7] An officer found James's body in the cellar and shortly thereafter an emergency medical technician confirmed that James was dead. After obtaining a search warrant, police collected several pieces of evidence from the Vatcher residence.[8]

The following day, a New Hampshire State trooper who had spotted the defendant driving in his car arrested him following a

---

a "suicide" note introduced in evidence, the defendant described himself as "the kind of guy who strikes back when struck," and wrote that he could "hit harder" than James could. The medical examiner who conducted the autopsy testified that he observed a number of bruises on James's body and limbs that were of different ages and varieties.

[5]The record indicates that the defendant tried to kill himself on two other occasions prior to his arrest the next day.

[6]In addition to the statement on the audiotape recording, the defendant made several other statements admitted in evidence, including statements in a suicide note written the day of the killing and a statement to police made after his arrest. The defendant filed various motions to suppress these statements, all of which were denied, except that his statement to police was redacted in part.

[7]The quotations are from a transcript of the audiotape recording admitted in evidence.

[8]The evidence consisted of two notes in the defendant's handwriting, a discharged cartridge casing, a spent projectile, and traces of blood. A few days later, the police secured a second warrant and retrieved a gun box and a shoelace or bootlace from the home. In a separate search, officers retrieved from the defendant's automobile a suicide note, a box of live rounds of .22 caliber ammunition, a gun lock, and a rifle which an expert subsequently

brief exchange. After being informed of and waiving his Miranda rights, the defendant gave a statement to police in which he admitted killing James.

The defendant did not testify at trial. The Commonwealth introduced in evidence his audiotape recording, the confession given to police, the suicide note, and other notes written by the defendant. The defendant was convicted as charged and filed a timely appeal.

2. The defendant argues that the judge committed reversible error by denying his request for a voluntary manslaughter instruction. In so doing, the judge concluded that the evidence did not show an "adequate, reasonable provocation" and thus, that under "no view of the evidence could a rational jury validly return a voluntary manslaughter [verdict]." We agree. "Voluntary manslaughter has been defined as a killing committed in 'a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987), quoting *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). See *Commonwealth* v. *Hicks*, 356 Mass. 442, 445 (1969).[9] An instruction on voluntary manslaughter is appropriate "if there is evidence of provocation deemed adequate in law to cause the

---

determined discharged the casing found in the Vatcher's home. All the items of physical evidence were admitted at trial.

[9]The Commonwealth argues that there is no evidence that the defendant acted on "sudden" provocation adequate to support an instruction on voluntary manslaughter. See, e.g., *Commonwealth* v. *LeClair*, 429 Mass. 313, 317 (1999), and cases cited (revelation "must constitute a 'sudden discovery' in order to reduce the degree of culpability"). The evidence indicates, among other things, that the defendant had been frustrated with James for some time and was "gonna do this a long time ago, but [he] kept putting it off." Years of frustration do not make for "sudden" passion or heat of blood. See, e.g., *Tripp* v. *State*, 36 Md. App. 459, 471-472 (1977) ("The law . . . recognizes human frailty when one is in the clutches of blind and sudden fury. The long-smoldering grudge, by way of contrast . . . is a telltale characteristic of premeditation"). The defendant's self-recorded and self-justifying statement after the incident that "the only way I could've done this is if I lost control and . . . I lost control this morning," even if claimed to be "sudden" provocation, was not provocation otherwise adequate at law to mitigate the murder of a misbehaving child by a parent.

accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). "The evidence must be sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), quoting *Commonwealth* v. *McLeod, supra* at 738. "In assessing whether a voluntary manslaughter instruction was warranted, we must consider the evidence in the light most favorable to the defendant." *Commonwealth* v. *Groome, supra* at 220. "If any view of the evidence . . . would permit a verdict of manslaughter rather than murder, a manslaughter charge must be given." *Commonwealth* v. *Rodriguez*, 431 Mass. 804, 812 (2000), quoting *Commonwealth* v. *Berry*, 431 Mass. 326, 334 (2000). However, a judge should not give a voluntary manslaughter instruction where the evidence does not support it. See *Commonwealth* v. *Groome, supra* at 220; *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 745-746 (1975).

The evidence was that on the morning of the shooting, James threw waffles in the trash, threw other objects around the house, kicked a brass planter, attempted to destroy his mother's birthday cards, got into a "wrestling match" with the defendant, hit the defendant with an afghan, kicked the defendant, followed him around the house and into the cellar three times, told the defendant he wanted him to leave the house, cursed at him, and laughed at the defendant when he cried. In short, the evidence described a child having an extended temper tantrum, which, according to his mother's testimony, was not atypical behavior for her son when he was at home.

It is well settled that "[i]nsults and quarreling alone cannot provide a reasonable provocation," even between adults. *Com-*

*monwealth* v. *Seabrooks*, 425 Mass. 507, 514 (1997), *S.C.*, 433 Mass. 439 (2001), quoting *Commonwealth* v. *Callahan*, 401 Mass. 627, 632 (1988). See *Commonwealth* v. *Groome*, *supra*, quoting *Commonwealth* v. *Estremera*, 383 Mass. 382, 392 (1981) ("verbal insults and arguments, even if obscene or hostile, cannot constitute sufficient provocation, for a reasonable person 'can be expected to control the feelings aroused' thereby"); *Commonwealth* v. *Masello*, 428 Mass. 446, 449 (1998) ("heated oral argument that escalated during the course of the evening, without more, does not constitute adequate provocation"). Indeed, a victim's offensive use of physical force against a defendant will not necessarily constitute "adequate provocation," particularly where the defendant responds with excessive force. See *Commonwealth* v. *Bianchi*, 435 Mass. 316, 329 (2001) (no adequate provocation where victim called defendant obscenity and punched defendant in face, where defendant was weightlifter, outweighed victim by over 170 pounds, was armed with fully loaded weapon, and was violating protective order in pursuing victim); *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973), *S.C.*, 391 Mass. 123 (1984) ("[i]t is an extravagant suggestion that scratches by the wife could serve as provocation for a malice-free but ferocious attack by the defendant with a deadly instrument").

This confrontation was between an adult and a child. However "provocative" in the ordinary sense of the term the actions of this eleven year old physically challenged boy may have been, however frustrating, annoying, and even infuriating his behavior, it did not rise to "adequate provocation" within the meaning of our laws. James's behavior may have warranted ordinary parental discipline, but such behavior cannot reasonably be said to have called forth the stark breakdown in self-control that may attend "the heat of blood" or sudden combat requirements and thereby mitigate murder to manslaughter. *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987). As the judge noted, no evidence suggested that James acted in "a way above and beyond causing a guardian or father to be exasperated, bothered, upset, impatient, lose one's temper."

The defendant argues, however, that the judge should have considered the defendant's actions "in the broader context of

the persistent difficulties" that he experienced in caring for James. The defendant contends that it was properly for the jury to decide whether the defendant's actions were reasonable "in the totality of the circumstances." This is incorrect. If anything, the evidence of James's "relentless," "oppositional," "frustrating," or "exasperating" behavior suggests that James's bad behavior on the day in question would have come as no surprise to the defendant, and would not have elicited "such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint." *Commonwealth v. Sirois*, 437 Mass. 845, 854 (2002).[10] We are persuaded from our careful review of the record that the judge considered all of the evidence and discussed the requested voluntary manslaughter instruction with counsel, before denying the requested instruction. There was no error.

3. The defendant asks that, in the interests of justice, we employ our extraordinary power under G. L. c. 278, § 33E, to reduce the jury verdict from murder in the first degree to voluntary manslaughter or, alternatively, to murder in the second degree.[11] For the reasons stated above, "there is no question of reducing the verdict below murder; the question that presents itself is the less drastic one whether there is ground for reducing from first to second degree murder." *Commonwealth v. Cadwell*, 374 Mass. 308, 316 (1978). See *Commonwealth v. Baker*, 346 Mass. 107, 109 (1963). We conclude that no such ground exists.

The defendant's own clear, unequivocal admissions in the audiotape recording, his handwritten note, and a voluntary confession to police, all entered in evidence at trial, amply support the

---

[10]*Commonwealth v. Schnopps*, 383 Mass. 178 (1981), *S.C.*, 390 Mass. 722 (1984), on which the defendant relies, does not persuade us that a different result is warranted. In that case, the critical factual issue was how long the defendant had known about the allegedly provocative act, the sudden discovery by the defendant of his spouse's infidelity. See *id.*

[11]The defendant cites *Commonwealth v. Azar*, 435 Mass. 675 (2002); *Commonwealth v. Woodward*, 427 Mass. 659 (1998); and *Commonwealth v. Vizcarrondo*, 427 Mass. 392 (1998), *S.C.*, 431 Mass. 360 (2000), for the argument that we should reduce the verdict in this case to voluntary manslaughter. Those cases, which involve the so-called "third prong" of malice, are inapposite. Here, the evidence of a specific intent to kill was clear, indeed overwhelming.

jury's finding that the defendant deliberately premeditated the killing with malice aforethought. The defendant stated that he "had been thinking about helping [James] end the suffering for a while," "was gonna do this a long time ago, but . . . kept putting it off," "bought a rifle and shot [James]," "hoped that [he] had hit [James] in the heart [because he] wanted him to die quick," and then "strangled [James] cuz he wasn't dead."[12] The verdict stands.

*Judgment affirmed.*

---

[12]*Commonwealth* v. *Kane*, 388 Mass. 128, 134 (1983); *Commonwealth* v. *Starling*, 382 Mass. 423, 425-426 (1981); and *Commonwealth* v. *Cadwell*, 374 Mass. 308, 316-320 (1978), on which the defendant also relies, do not persuade us to reduce the verdict to murder in the second degree. Each of these cases involved beatings to young children where the evidence of deliberate premeditation was either nonexistent or insufficient. See *Commonwealth* v. *Kane*, *supra* at 129 n.1 (unclear under which theory of murder in the first degree Commonwealth proceeded, but judge entered required finding of not guilty on that portion of the indictment); *Commonwealth* v. *Starling*, *supra* at 425; *Commonwealth* v. *Cadwell*, *supra* at 316-317 (although evidence of deliberate premeditation could "perhaps be pieced out of the evidence," the "surest surmise is that the lethal blows were struck by the defendant in an excess of anger and frustration," and thus there was "an irreducible doubt in all the circumstances whether the defendant consciously formed a purpose that morning to do the child mortal injury"). In this case, the jury had strong evidence, including the defendant's own words, to support a finding of deliberate premeditation.