Melvin L. HIGH, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–1397.

District of Columbia Court of Appeals.

Argued Dec. 12, 2008.

Decided June 4, 2009.

Veronice A. Holt, Washington, was on the brief for appellant.

Amanda J. Williams, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Thomas J. Tourish, Jr, and Angela G. Schmidt, Assistant United States Attorneys, were on the brief for the appellee.

Before WASHINGTON, Chief Judge, KRAMER, Associate Judge, and FARRELL, Senior Judge.[1]

WASHINGTON, Chief Judge:

Just after midnight on December 12, 2000, Melvin L. High shot his childhood friend, Lamar Gaither, fifteen times, killing the 20–year old on the street outside High's house.

High was indicted by a grand jury on September 19, 2001, for charges including first-degree murder while armed (D.C.Code §§ 22–2101, –3202 (2001)), possession of a firearm during a crime of violence or dangerous offense (§ 22–3204(b)), carrying a pistol without a license (§ 22–3204(a)), and unlawful possession of ammunition (§ 6–2361(3)).

After a jury trial on December 9, 2002, the jury convicted High of voluntary manslaughter while armed (as the lesser-in-

---

1. At the time of argument, Judge Farrell's status was Associate Retired Judge.

cluded offense of first-degree murder while armed), possession of a firearm during a crime of violence, carrying a pistol without a license, and unlawful possession of ammunition.

On appeal, High's primary argument is that his conviction for voluntary manslaughter should be reversed because there was insufficient evidence of provocation to support instructing the jury on voluntary manslaughter as a lesser-included offense of murder. For the following reasons, we agree that there was instructional error; however, because it was harmless, we affirm.[2]

## I.

### FACTS

#### A. The Murder

The morning of the murder, Gaither's mother, Diane, fixed Gaither and High breakfast at Gaither's home, and she took a picture of the two before they left the house. In the photo, High was wearing a green Eddie Bauer coat, a Redskins sweater, blue jeans and a red Redskins baseball cap.

After breakfast, Gaither and High drove to pick up Odell Smallwood, Gaither's cousin. Gaither smoked marijuana with Smallwood and drank alcohol with High. Later that day, the three men drove to a house to visit High's adult step-sister, Angela Nivens, and three of her friends. Smallwood and Gaither smoked more marijuana, while High and Gaither continued to drink. At some point that evening, Gaither went upstairs with Nivens where they stayed for 20 to 25 minutes before coming down together. Upon seeing the two return, High appeared none too pleased. When Gaither, High, and Smallwood left the house, High saw Nivens give Gaither a kiss on the cheek.

2. We summarily address one of High's collateral arguments on appeal in which he contends that the trial court abused its discretion by excluding his expert evidence on bullet bunter-marks, a manufacturer's stamping on a bullet. High offered The George Washington University Professor James E. Starrs as an expert on ballistics to testify that the methodology underlying the government's bunter evidence had not been scientifically proven, thereby challenging the government's evidence that the bullets recovered from the crime scene came from the same box of bullets found in High's bedroom. After considering the nature of the subject matter and the professor's qualifications, the trial court determined that Professor Starrs was not an expert in the area of firearms and tool marks; and thus, he could not testify as to the buntermark comparisons. See Dyas v. United States, 376 A.2d 827, 832 (D.C.1977) (articulating five subject matters and testimonial qualifications governing the admissibility of expert testimony). Moreover, the trial court concluded that the professor's testimony would have confused the jury rather than assisted it.

A "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and [the court's] action is to be sustained unless manifestly erroneous." Smith v. United States, 389 A.2d 1356, 1358 (D.C.1978) (quoting Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). In the field of firearms, bullet bunter-marks is a scientific subject that lies beyond the knowledge of the average layman. While Professor Starrs may have been deemed an expert in certain areas of forensic science, he did not have sufficient expertise in ballistics and tool marks to provide the jury with an opinion that would have aided it in the search for truth. See Dyas, supra, 376 A.2d at 832 ("the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth"). Despite his many accomplishments, the professor lacked experience with firearms, he had no published articles regarding any experiments he conducted on firearms or tool mark evidence, and he had not testified in a case on the subject of buntermarks. Accordingly, based on Professor Starrs's qualifications and experience, the trial court did not abuse its discretion by excluding him as an expert witness in High's case.

When the three men got into the car, High began yelling at Gaither and asking him what went on between himself and Nivens upstairs. According to Smallwood, High and Gaither were arguing back and forth with High yelling, "How the fuck you going to fuck my sister?," and Gaither responding, "Man, stop tripping off that shit." Smallwood testified that he had never seen High so upset.

High told Smallwood to drive him home. When they arrived, High got out of the car and went inside his house. Smallwood pulled the car over to the opposite side of the street, and Gaither got out of the car telling Smallwood that "he was going to go get his stuff." Smallwood remained in the car and waited for the two men to return.

About three or four minutes later, Smallwood heard "some shots" and ducked down inside the car. When he looked up, he saw High in the middle of the street standing over Gaither. Gaither was on his knees with his hand raised over his head. Smallwood could not see a weapon, but testified that it looked like High was hitting Gaither with his hand. Smallwood started the car, put it in reverse and backed down the street. Soon Smallwood heard several more shots, and when he looked back, he could see Gaither slouched down where he had been kneeling in the middle of the street.

Smallwood's testimony was corroborated in large part by Benson Medley, the boyfriend of High's mother, Cassaundra Britton. Medley testified that on the evening in question, he was at Britton's home around 10:00 P.M., when he heard "some people" walk past Britton's bedroom and head upstairs to the attic, where High roomed. After hearing a "commotion" or "tussling" upstairs that sounded like someone was moving furniture, Medley heard what sounded like two people coming back down the stairs. Later, when Medley looked out of the window, he saw High and Gaither standing on the sidewalk talking loudly. Medley turned away from the window to watch Monday Night Football and, a few seconds later, heard a gunshot.

Medley went back to the window and saw High standing next to a half-clothed Gaither who was staggering across the street to a spot next to a tree beneath a street light. After Medley saw Gaither and High make it across the street, he saw Gaither fall to his knees before High shot Gaither four or five times while Gaither was lying on the ground with his arm in front of his face. According to Medley, High then stepped back, hit the butt of his gun, and fired seven or eight more shots. Medley then called the police. Medley's account was corroborated, in part, by the testimony of two neighbors.

## B. *The Jury Instructions*

After all of the evidence had been presented, the trial court decided, *sua sponte*, to instruct the jury on second-degree murder and voluntary manslaughter as lesser-included offenses of first-degree murder. As it relates to the voluntary manslaughter instruction, the trial court contended that the instruction was warranted because the jury could conclude that High killed Gaither in the heat of passion provoked by the fact that Gaither may have engaged in sexual relations with High's step-sister, Nivens.

High objected to the jury being instructed on voluntary manslaughter, his defense being that someone else shot Gaither. However, the government (albeit with some reluctance) agreed with the trial court that there was sufficient evidence of provocation to warrant such an instruction. The jury ultimately convicted High of voluntary manslaughter.

High contends that the trial court erred, first, in *sua sponte* suggesting that the jury be instructed on voluntary man-

slaughter, and second, in finding that there was sufficient evidence of adequate provocation to support such an instruction.

## II.

### ANALYSIS

### A.

On several prior occasions we have recognized that a trial court's *sua sponte* suggestion of a lesser-included offense instruction is not error simply because the trial court acts of its own accord. *See Hawthorne v. United States,* 829 A.2d 948, 952 (D.C.2003) (no error where trial court raised instruction *sua sponte* during jury trial); *Mungo v. United States,* 772 A.2d 240, 243–44 (D.C.2001) (no error where trial court raised instruction *sua sponte* during bench trial); *see also Bostick v. United States,* 605 A.2d 916, 920 (D.C. 1992) (first recognizing a trial court's authority to give a lesser-included instruction *sua sponte* ). We have explicitly recognized that "a trial court is under no duty to sit quietly and refrain from even mentioning a lesser included instruction until one of the parties requests it[.]" *Hawthorne, supra,* 829 A.2d at 952. Thus, even though generally it is the defendant or the government that requests such an instruction, the trial court need not stand idly by and wait for either party to raise the issue. Accordingly, High's claim that it was error for the trial court to *sua sponte* suggest to the parties that the jury be instructed on the lesser-included offense of voluntary manslaughter is without merit.

But regardless of whether the trial court is acting *sua sponte,* or at the behest of either party, a lesser-included offense instruction must be supported by sufficient evidence before it is properly presented to a jury. *See Hawthorne, supra,* 829 A.2d at 951–52. In this case, High argues that the trial court erred by giving the manslaughter instruction because there was insufficient evidence of adequate provocation to support the instruction.

### B.

Voluntary manslaughter is an unlawful, intentional killing that would be second-degree murder but for the presence of mitigating circumstances, which "exist where [the] person acts in the heat of passion caused by adequate provocation." *Lee v. United States,* 959 A.2d 1141, 1143 n. 5 (D.C.2008) (*quoting Criminal Jury Instructions for the District of Columbia,* No. 4.19 B (4th ed.1993)); *accord, Comber v. United States,* 584 A.2d 26, 42–47 (D.C.1990) (providing an in-depth analysis of the offense of voluntary manslaughter); *United States v. Bradford,* 344 A.2d 208, 214–15 (D.C.1975) (same). The presence of adequate provocation is necessary to mitigate murder to voluntary manslaughter. *See Comber, supra,* 584 at 42–47.

Whether there was adequate provocation is an objective inquiry. *See Brown v. United States,* 584 A.2d 537, 542–43 (D.C.1990) (discussing the formulation of voluntary manslaughter test). "The test of sufficiency of such provocation is that which would cause an ordinary man, a reasonable man, or an average man, to become aroused as to kill another." *Id.* (quotations and internal citation omitted). In other words, provocation is adequate where it would "naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection." *Id.* at 543 n. 17 (citing *Austin v. United States,* 382 F.2d 129, 137 (D.C.Cir.1967)). Therefore, in order to conclude that the evidence presented in High's case was sufficient to support a voluntary manslaughter instruction, we must be satisfied that a reasonable man would have been induced to lose self-control and kill his good friend, on

impulse, without reflection, because he believed that his friend engaged in sexual relations with his adult step-sister.

According to the evidence admitted at trial, High was upset when he saw his good friend, Gaither, and his step-sister, Nivens, coming downstairs together after being upstairs for some 20 to 25 minutes. High became even more upset when Nivens kissed Gaither on the cheek as Smallwood, High and Gaither left the party. High verbally confronted Gaither about the situation, yelling at him and demanding to know what went on upstairs at the party between Gaither and Nivens. Gaither dismissed High by responding, "Man, stop tripping off that shit."

We do not doubt that High was extremely upset and perhaps even enraged by the idea that Gaither and Nivens may have engaged in sexual relations. But rage alone is insufficient to support a voluntary manslaughter instruction as a lesser-included offense because there must also be adequate provocation. *See e.g., Harris v. United States,* 373 A.2d 590, 592–93 (D.C.1977) (appellant not entitled to voluntary manslaughter instruction where he became enraged after having door slammed in his face).

Provocation mitigates murder to manslaughter in only the most exceptional cases. These are cases where a deceased provoked a defendant by committing an offense that was so grave, and so heinous, that society partially excuses or justifies the defendant's response because "people provoked so strongly cannot be expected to behave any differently." *See* Susan D. Rozelle, *Controlling Passion: Adultery and the Provocation Defense,* 37 Rutgers L.J. 197, 208 (2005) (discussing society's excuse and justification of mitigating murder committed in the heat of passion); *accord,* Laurie J. Taylor, *Comment: Provoked Reason in Men & Women: Heat of Passion Manslaughter & Imperfect Self-*

*Defense,* 33 UCLA L.Rev. 1679 (1986). Hence, "the law does not excuse actors whose behavior is caused by just any emotional disturbance." *See People v. Pouncey,* 437 Mich. 382, 471 N.W.2d 346 (1991) (citing Michael S. Moore, *Causation and the Excuses,* 73 Cal. L.Rev. 1091, 1132 (1985)) (the victim's provoking act must arouse the defendant's emotions to such a degree that it distorts his very process of choosing).

> The provocation must be so serious that we are prepared to say that an ordinary person in the actor's circumstances, even an ordinarily law-abiding person of reasonable temperament, might become sufficiently upset by the provocation to experience substantial impairment of his capacity for self-control and, as a consequence, to act violently.

Joshua Dressler, *Why Keep the Provocation Defense?: Some Reflections on a Difficult Subject,* 86 Minn. L.Rev. 959, 974 (2002); *accord State v. Shane,* 63 Ohio St.3d 630, 590 N.E.2d 272, 276 (1992) ("Our criminal law recognizes that the provoked defendant is less worthy of blame than the unprovoked defendant, but the law is unwilling to allow the provoked defendant to totally escape punishment."). Essentially, the provocation must be so extreme that a reasonable person could conclude that the "[the deceased] had it coming." Rozelle, *supra,* at 210 (citation omitted).

Gaither's alleged sexual encounter with Nivens was certainly not so heinous that it would dominate the volition of a reasonable man, suspend his exercise of judgment, dethrone him of reason, and cause him to suffer a "stark breakdown in self-control." *See Commonwealth v. Vatcher,* 438 Mass. 584, 781 N.E.2d 1277, 1282 (2003) (the deceased's behavior, "however annoying, frustrating, and even infuriating," must still be of the magnitude that it

rises to the level of adequate provocation within the meaning of the law); *accord* Joshua Dressler, *Criminal Law: Rethinking Heat of Passion: A Defense in Search of a Rationale*, 73 J.Crim. L. & Criminology 421, 442 (1982).

There was evidence presented that High and his step-sister, Nivens, were not particularly close. In fact, they had little to no contact with one another after Nivens turned 13–years–old. At the time of the murder, High and Nivens were adult step-siblings and did not enjoy the type of close, personal, and committed relationship that is generally present in cases where courts have found there to be evidence of adequate provocation to support an instruction for voluntary manslaughter. *See United States v. Comer*, 421 F.2d 1149, 1151–55 (D.C.Cir.1970) (appellant entitled to a voluntary manslaughter instruction where there was evidence that he killed wife of 19 years after fighting with her about her adulterous relationship with a man she let move into their home while appellant was away, allowed to repeatedly call her at their home, and come by the home honking his horn); *Gonzales v. State*, 546 S.W.2d 617 (Tex.Crim.App.1977) (husband adequately provoked when he killed his wife's lover after discovering the two in bed together at a local motel).

Moreover, in this case, there was no evidence that Gaither and Nivens actually had a sexual encounter. High simply saw Gaither and Nivens go upstairs together and later return to the area where he and Smallwood were drinking and smoking marijuana. High only observed Nivens give Gaither a kiss on his cheek. Hence, in addition to the fact that High and Nivens were not particularly close, High's reaction was based on nothing more than mere suspicion; and mere suspicion is not enough. *See Nicholson v. United States*, 368 A.2d 561, 565 (D.C.1977) (wife was not entitled to a voluntary manslaughter instruction when she claimed that she was provoked to kill her husband because she was suspicious of his past adultery); *State v. Cooley*, 342 S.C. 63, 536 S.E.2d 666 (2000) (insufficient evidence of adequate provocation where defendant, acting on suspicion alone, had accused his live-in girlfriend of infidelity before stabbing her to death).[3]

Furthermore, Nivens was 29–years–old at the time of the alleged encounter with Gaither, and there was no evidence that she was particularly vulnerable or had been violated. So, when High shot Gaither—after a car ride to High's home—he was not suddenly reacting to a heinous assault upon a close family member or in response to discovering that a young relative was abused by a trusted friend. *See Lee, supra*, 959 A.2d at 1144–45 (defendant was entitled to a voluntary manslaughter instruction where there was evidence that he stabbed to death his 11–year–old daughter's molester moments after the child told the defendant that the adult man had kissed and licked her); *Paz v. State*, 777 So.2d 983 (Fla.Dist.Ct.App.2000) (defendant adequately provoked where he stabbed his friend during his holiday party

---

**3.** *See also People v. Arnold*, 17 Ill.App.3d 1043, 309 N.E.2d 89, 92 (1974) (husband's long-held belief that his wife was unfaithful was held not to be a sufficient basis for a voluntary manslaughter instruction); *State v. Fleming*, 2001 WL 871397 (Ohio Ct.App.2001) (jealous defendant was not entitled to voluntary manslaughter instruction where he murdered his estranged girlfriend after seeing her walk out of her place of employment with a male co-worker whom was not known to the defendant, not talking to the girlfriend, and not touching her in anyway); *Garza v. State*, 878 S.W.2d 213, 217–19 (Tex.Ct.App.1994) (jealous husband who stabbed to death a man sitting next to wife at a party based on his mere suspicions that the man was having an affair with her was not entitled to voluntary manslaughter instruction).

upon discovering that his friend had just raped the defendant's wife upstairs in their home that night); *State v. Munoz*, 113 N.M. 489, 827 P.2d 1303 (1992) (defendant entitled to voluntary manslaughter instruction where he killed father-in-law after learning father-in-law sexually molested daughter); *Commonwealth v. Berry*, 461 Pa. 233, 336 A.2d 262 (1975) (remanding for new trial upon finding evidence of adequate provocation where defendant killed the man who struck his mother to the ground).[45]

It is in these types of circumstances that society mitigates culpability for certain acts where in the interest of social order we cannot altogether excuse those acts.[6] But such mitigation is warranted only where a reasonable person would succumb to the extreme provocation and lose the ability to act rationally.[7] Based on the circumstances presented here, we are satisfied that a reasonable person would not have lost his self-control and killed a close, childhood friend merely because he believed that his friend had a sexual encounter with his adult step-sibling. *See* Dressler, *Why Keep the Provocation Defense?, supra,* at 967–73 (the perpetrator's actions must be so utterly offensive that the defendant's response was "within the range of expected human responses to the provocative situation"). Accordingly, the evidence in this case did not support a voluntary manslaughter instruction as a mitigation for murder because there was insufficient evidence presented that High was adequately provoked to kill Gaither. Thus, the trial court erred by instructing the jury on the less-

4. *But see also State v. Martin*, 216 S.C. 129, 57 S.E.2d 55 (1949) (a highly nervous and agitated husband was adequately provoked to kill the man who had violently raped his wife and continued to taunt their family by coming by their home and calling for her); *Toler v. State*, 152 Tenn. 1, 260 S.W. 134 (1924) (father adequately provoked where he killed a close family friend after learning that his friend had coaxed the father's 15–year–old daughter into drinking whiskey so he could sexually abuse the child in a field near father's home); *State v. Flory*, 40 Wyo. 184, 276 P. 458 (1929) (remanding for new trial where son-in-law killed his wife's father upon learning father raped her in their home); *c.f. State v. Rainey*, 574 S.E.2d 25 (2002) (recognizing that brother who killed step-brother would have been entitled to voluntary manslaughter instruction but for adequate cooling time between killing and discovering step-brother's incest with 13–year–old sister).

5. Furthermore, Gaither's words to High could not have amounted to adequate provocation because, as we have long held, "[m]ere words standing alone, no matter how insulting, offensive, or abusive, are not adequate provocation." *Nicholson, supra,* 368 A.2d at 565 (words do not constitute adequate provocation because they amount to "a trivial or slight provocation, entirely disproportionate to the violence of the retaliation"); *accord West v. United States*, 499 A.2d 860 (D.C.1985) (provocation not adequate where unarmed victim walked toward armed defendant while they merely exchanged unpleasant words).

6. *See* Oscar Leroy Warren & Basil Michael Bilas, Warren on Homicide § 90, at 434 (Dennis & Co. perm. ed., 1938) (1914); *see also* Dressler, *Why Keep the Provocation Defense?, supra.*

7. In his discussion on the necessity for the reasonable person standard in the adequate provocation test, law professor Arnold H. Loewy rationalizes the need for this standard:

If reasonableness were not required, a man who flew into a rage and killed a woman for refusing to have sex with him would be guilty of nothing more than manslaughter. Furthermore, when the law rewards irrational behavior, it encourages people to feign irrationality. Thus, if the man in the above hypothetical had coolly decided to kill the woman as punishment for her refusal, he would be encouraged to feign rage in order to mitigate his crime.

Arnold H. Loewy, *Culpability, Dangerousness, & Harm: Balancing the Factors on which our Criminal Law is Predicated*, 66 N.C. L.Rev. 283, 302–03.

er-included offense of voluntary manslaughter.

## C.

■ Because High objected to the trial court instructing the jury on voluntary manslaughter, we review the error for harmlessness. *See Mitchell v. United States,* 595 A.2d 1010, 1012 n. 4 (D.C.1991); *see* Super. Ct.Crim. R. 30, 52(b) (2008). "[T]o conclude that the instructional error in a case is harmless, we must be satisfied 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" [8] *Tyree v. United States,* 942 A.2d 629, 638 (2008) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

In other words, we must be satisfied that the evidence pointing to High as Gaither's murderer is so strong that, without the erroneous invitation the jury received to consider mitigation as a defense, there is no reasonable probability that it would have acquitted him of second-degree murder. Because we are satisfied that the evidence of his identity meets that test, High's conviction for manslaughter—a crime having the same definitional elements as second-degree murder, *see Crim. Jury Instruction for the District of Columbia,* No. 4.20 B (2008)—may properly stand.

High's defense in this case was that he was a victim of mistaken identity. The government, however, presented strong evidence that High was, in fact, the shooter. The government's key identification witness, Mr. Medley, was the boyfriend of High's mother, Ms. Britton. At the time of the shooting, Medley had been dating Ms. Britton for several months and there was

evidence presented that he spent a significant amount of time over the course of those months at Ms. Britton's home where he came into contact with High on a fairly regular basis. Evidence was presented that, on the weekend before the shooting, Medley helped Ms. Britton celebrate High's birthday at a restaurant in Baltimore. According to Medley, on the evening of High's birthday celebration, High was wearing an olive-colored coat and a Redskins baseball cap.

Medley testified that on the night of the shooting he was watching Monday Night Football in Ms. Britton's bedroom when he heard what sounded like several people running up the stairs to the attic where High was staying. He testified that he heard some noise from the room that sounded like tussling as if furniture was being moved and then heard footsteps heading back down the stairs toward the front door. At that point, Medley heard loud talking coming from an area right below Britton's bedroom window. When he looked outside he saw High and Gaither standing on the sidewalk talking loudly. High was wearing the same coat and baseball cap that he had worn at his birthday dinner the weekend before. Medley testified that he turned away to watch the football game and heard gunshots seconds later. After initially ducking, he went to the window and saw Gaither staggering across the street accompanied by High. Medley testified that when Gaither reached an area across the street beneath a streetlight and near a tree, High fired four to five shots at Gaither while Gaither was on the ground trying to protect himself. High then stepped back, hit the butt of the gun, and fired seven or eight more

---

8. The heightened constitutional standard articulated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), does not apply here since there was no error in the voluntary manslaughter instruction itself. *See Tyree, supra,* 942 A.2d at 638.

shots at Gaither before walking down the street.

The defense impeached Medley through testimony presented by an investigator working for High. The defense investigator testified that when he initially questioned Medley about the incident, Medley told him that he had not seen anything and did not know anything about the shooting. Further, the defense investigator testified that, as a part of his investigation, he visited Britton's house and, based on his observations from her bedroom window, Medley could not have seen everything that he testified he observed the night of the shooting. The defense also attempted to impeach Medley by presenting evidence that Medley's attorney had inquired of the police about a possible reward for Medley because of the valuable evidence Medley had provided in this case.

Although portions of Medley's testimony were impeached by the defense investigator, Medley's identification of High as the shooter was not significantly challenged. Further, Medley's credibility was bolstered during rebuttal when the government introduced his prior statement to the police, which was consistent with his trial testimony. In addition, evidence was adduced at trial that, within the two days immediately following the shooting, Medley told several of his co-workers, including his supervisor, what he had seen that evening and those statements were also consistent with his testimony at trial. This evidence effectively rebutted any suggestion that Medley's statements to the police had been fabricated for financial gain. Moreover, Medley testified that he never followed up on his attorney's inquiry about a possible reward and, in fact, had never received a reward for the information he provided to the police.

Mr. Smallwood, another key witness, testified that, a few minutes after he had driven High and Gaither back to High's home, he heard gunshots while he was sitting in the car waiting for High and Gaither to return. According to Smallwood, he immediately ducked down and away from the car windows, but when he looked up, he saw High standing over Gaither moving his hand up and down like he was hitting him. Smallwood testified that at that point, he put the car in reverse and backed down the street to an area away from High and Gaither.

Smallwood was impeached at trial with his prior grand jury testimony, in which he testified that he had not seen anything on the night of the shooting. In an effort to rehabilitate him, the government presented evidence that Smallwood subsequently pled guilty to perjury for his false testimony before the grand jury and agreed to testify for the government in this case.

The government also presented the testimony of two other witnesses, Ms. Geraldine McKennon and Mr. Solomon Bush. Both testified that they saw the shooting take place in the middle of the street not far from their respective homes, and that the shooter was a male who was between 5′6″ and 5′9″ tall with a build similar to High. Bush testified that the shooter was wearing a dark coat, jeans, and a red baseball cap. McKennon described similar clothing although she did not refer to the pants as jeans, and she testified that she thought the shooter was wearing a skull cap.

The only other identification evidence presented to the jury was by the defense. The defense presented evidence that someone other than High had approached a police officer and had inquired about a shooting that night. According to the officer, the person who approached him was wearing jeans, a dark jacket and a red baseball cap. This evidence was only used to try to raise questions about the descriptions of the shooter given by Bush and McKennon; however, there was no evi-

dence presented that the person who approached the officer matched High's build or that he was wearing a Redskins cap.

Thus, taken as a whole, the evidence that High was the shooter in this case is quite compelling. This is not a one witness stranger identification case. Both Medley and Smallwood knew High very well and both put High at the scene of the murder on the night of the murder, making aggressive motions toward Gaither while he was crouched in the street, and both heard a series of gunshots ring out. While the evidence that Smallwood perjured himself before the grand jury is of no small matter, there does not appear to have been any pressure, other than the force of the evidence in this case, that led him to recant his grand jury testimony and plead guilty to perjury. As for Medley, the defense was unable to significantly undermine Medley's testimony at trial about what he had seen that evening from Britton's bedroom window. The fact that, from the very beginning, he gave his co-workers and the police a consistent account of what he had seen on the night of the murder substantially bolstered Medley's credibility. Further, the testimony of McKennon and Bush, the two other witnesses to the murder, corroborates the testimony of Medley and Smallwood in important ways with respect to details about the shooting, as well as the description of the shooter, who was approximately the same height and build as High and who, on the night of the shooting, was wearing clothes similar to those Medley

recalled High wearing at his birthday dinner and Smallwood remembered High was wearing the night of the shooting.[9]

Based on this evidence, we are satisfied that there is no reasonable possibility that the jury believed someone other than High was the shooter in this case, and therefore, there is no reasonable probability that the jury's verdict of voluntary manslaughter was a compromise verdict between an outright acquittal and conviction for second-degree murder. Here, the erroneous instruction resulted in a windfall for High because it allowed the jury to convict him of a lesser-included offense to which he was not entitled, as a matter of law, to have the jury consider. Had the trial court not given the erroneous instruction, we are satisfied on this record, that the jury would have found High guilty of second-degree murder because the government produced overwhelming evidence that High was the person who intentionally shot Gaither and caused his death without adequate provocation.

### III.

### CONCLUSION

For the foregoing reasons, we are satisfied that the error complained of here was harmless and the decision of the trial court is hereby

*Affirmed.*

---

9. Angela Nivens also testified that, on the night of the shooting, High was wearing a

coat, blue jeans, and a Redskins cap.