COMMONWEALTH vs. CESAR C. ANDRADE.

Bristol. November 9, 1995. - March 6, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED, JJ.

*Homicide. Evidence,* Hearsay, Inflammatory evidence, Videotape, Photograph. *Practice, Criminal,* Comment by judge, Argument by prosecutor, Instructions to jury, Capital case.

At the trial of an indictment for first degree murder in which the evidence could have supported a verdict of voluntary manslaughter committed in the heat of passion based on provocation, erroneously admitted hearsay evidence of the defendant's prior abuse of the victim was merely cumulative of ample other evidence of the defendant's intent and state of mind and could not have prejudiced the jury, considering the weakness of the case for a. verdict of voluntary manslaughter and a lengthy curative instruction given as part of the judge's final charge to the jury. [237-242] O'CONNOR, J., dissenting, with whom LIACOS, C.J., joined.

At the trial of an indictment for first degree murder the judge did not abuse his discretion by permitting the showing of one videotape that was a fair depiction of the crime scene, a second videotape showing the layout of the apartment, and admitting in evidence fifty-one other still photographs and nine autopsy photographs, as they were probative on the issues of the defendant's veracity, manslaughter, premeditation, and extreme atrocity or cruelty. [242-243]

At a murder trial no substantial likelihood of a miscarriage of justice was created by the judge's brief preliminary remark to the jury or by the prosecutor's closing argument. [244]

At a murder trial the judge did not err in omitting instructions on self-defense or on the defendant's voluntary intoxication as that bore on the knowledge aspect of the third prong of malice aforethought, where there was no basis in the evidence for such instructions. [245-246]

INDICTMENT found and returned in the Superior Court Department on May 8, 1989.

The case was tried before *James J. Nixon,* J.

*Charles W. Rankin* for the defendant.

*Kevin Connelly,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the

defendant, Cesar C. Andrade, of murder in the first degree of his wife, Maria Andrade.[1] Represented by new counsel on appeal, the defendant argues that the erroneous admission of hearsay evidence from five witnesses, who testified that the victim had told them of various acts of physical abuse and intimidation committed by the defendant, requires a new trial. We conclude that this evidence, while wrongly admitted, could not have prejudiced the defendant and did not deprive him of a fair trial. We reject the defendant's other arguments that he should be granted a new trial because of the admission of inflammatory videotapes and photographs, improprieties in the prosecutor's closing argument, and errors in preliminary and final instructions to the jury. We also conclude that no basis exists to exercise our authority under G. L. c. 278, § 33E (1994 ed.), to reduce the verdict to one of voluntary manslaughter or to grant a new trial. Accordingly, we affirm the defendant's conviction of murder in the first degree.

We shall report in more detail the evidence and other pertinent matters in connection with our discussion of the issues raised on appeal. As a preliminary point, it is sufficient to note that the defendant conceded that he had killed his wife in the early morning hours of April 26, 1989, but contended that he had acted without malice, in the sudden transport of passion, and was, therefore, not guilty of murder in the first degree.

1. Viewing the evidence in the light most favorable to the defendant, see *Commonwealth* v. *Schnopps*, 383 Mass. 178, 179 (1981), *S.C.*, 390 Mass. 722 (1984), voluntary manslaughter was a possible verdict, although an unlikely one. A verdict of voluntary manslaughter is warranted "if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Id.* at 180. A killing committed subsequent to the *sudden* discovery of present spousal

---

[1] The Commonwealth proceeded on the basis that the jury would be warranted in returning a verdict of murder in the first degree either on the basis of premeditation or extreme atrocity or cruelty. So far as can be determined from the record, the verdict slip did not require the jury to choose between these theories. The defendant does not contend that the record lacks adequate evidence to support the jury's verdict of murder in the first degree on each theory.

infidelity, see *Commonwealth* v. *Bermudez*, 370 Mass. 438, 440-442 (1976), before a reasonable person would be expected to regain emotional control and before the defendant has regained emotional control, could constitute voluntary manslaughter. See *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). See also W.R. LaFave & A.W. Scott, Substantive Criminal Law § 7.10 (d) & (e) (1986). Here, the evidence would have supported an inference that the defendant had observed his wife with another man on the evening of April 25, 1989, thus confirming a suspicion of unfaithfulness the defendant had entertained for several weeks. The killing may have occurred within seven hours of the defendant's confirmation of his wife's infidelity. Despite a relatively long "cooling off period," the jury could have found that the defendant had lost, and not regained, control of himself at the time of the killing, and that this failure was not unreasonable in the circumstances. These were questions of fact for the jury, who were instructed on voluntary manslaughter committed in the heat of passion, and who rejected this as a verdict.[2]

The defendant argues, however, that certain erroneously admitted evidence significantly prejudiced the jury's consideration of this issue. We now describe that evidence. During her opening statement, the prosecutor told the jury that they would hear witnesses testify that the victim had told them, in the weeks preceding her death, that the defendant had threatened and beat her. Over the defendant's objection, five

---

[2]The judge also instructed the jury that if they found that the victim had struck a first blow, stirring the defendant to respond in the heat of passion, and without malice, then a verdict of voluntary manslaughter would be warranted. On no reasonable view of the evidence could the victim's death be considered voluntary manslaughter based on loss of control provoked by sudden combat. "[P]hysical contact between a defendant and a victim is not always sufficient to warrant a manslaughter instruction, even when the victim initiated the contact." *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980). See *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973), *S.C.*, 391 Mass. 123 (1984). In two statements to the police, the defendant never suggested that the victim had attacked him. His wounds were minor. He admitted to "finish[ing] [the victim] off" by deliberately stabbing her in the back while she lay on the floor of the bathroom. Even assuming that the victim attempted to fend him off with the knife, this would not be adequate provocation, as matter of law, for a deliberate killing in this manner. This instruction provided the defendant with a benefit he clearly was not entitled to.

witnesses testified to hearing from the victim that she had been beaten by the defendant. Several witnesses testified that the victim told them the defendant had threatened to kill her. One of the victim's sisters testified that the victim had told her of beatings and threats. The victim also told this sister that, if the victim locked herself in the bedroom or the bathroom, the defendant would pick the locks to gain access to her, and that he had ripped up her clothes so she could not go out. The victim's brother testified that the victim told him the defendant had ripped out some wiring in her automobile so that she could not go out.

As the Commonwealth properly conceded at trial, after the prosecutor studied more carefully decisions that she had relied upon to gain admission of the testimony, the evidence was inadmissible hearsay. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 282-283 (1990); *Commonwealth* v. *Lowe*, 391 Mass. 97, 105, cert. denied, 469 U.S. 840 (1984). The question, then, becomes whether the error caused prejudice to the defendant, requiring reversal of the verdict. See *Commonwealth* v. *Zagranski, supra* at 283. The defendant argues that he incurred prejudice because the admission of the evidence strongly tended to suggest that the victim's death was the culmination of weeks of beatings and threats, rather than the product of a sudden loss of self-control caused by proof of sexual infidelity.

We agree that the erroneously admitted evidence was relevant to the defendant's intent and state of mind with regard to the victim. Nonetheless, because of the nature of the evidence as a whole, we conclude that the testimony at issue could not have prejudiced the defendant or denied him a fair trial.

In addition to the hearsay evidence of spousal abuse described above, the Commonwealth's case contained compelling admissible evidence of considerable marital discord. The defendant's brother and sister-in-law, who lived in the second-floor apartment above the apartment shared by the victim and the defendant, regularly heard loud arguments between the couple during the three to four weeks leading up to her death. The defendant told his brother that the couple were having marital problems and that the victim was planning to leave him. Sometime in the week preceding the victim's death, the defendant shared a pizza with his sister-in-

law and another woman. Each of these women heard the defendant express an intent to kill his wife first, and then to kill himself. Three days before the killing, the victim's younger sister saw the defendant deliberately hit the victim's automobile with his automobile, and then attempt to hit the victim. On the evening of April 25, the defendant was observed to hit the victim's automobile with his own, hard enough to break the taillight of the victim's automobile. In his statement to the police, the defendant confirmed this history of recent marital discord. He had suspected the victim of "running around on him" for a lengthy period of time, and he had been following her to find out if this was true. About three weeks before her death, he said, he had damaged her automobile to keep her at home.

The erroneous admission of the victim's statements should not have occurred. Had they provided the only relevant evidence bearing on the relationship between the defendant and the victim, a new trial would be required. Here, there was ample other evidence of threats, acts of physical violence, marital discord, and suspicions of infidelity, to render the erroneously admitted evidence cumulative on the points of the defendant's intent and his state of mind on the evening of the killing.

Moreover, even viewing the evidence in the light most favorable to the defendant, the case for voluntary manslaughter was weak at best. According to the defendant's statement, after he had seen his wife in an automobile with another man around 9 P.M. on April 25, he "felt relieved that he had finally gotten proof that his wife was . . . cheating on him." Around 10 P.M., he had what he described as a comparatively amicable discussion of their situation with the victim.[3] She then went to bed and to sleep, and he stayed up for a little while, drinking blackberry brandy, before also going to bed and to sleep, in a separate bedroom. When he "finish[ed the victim] off" by stabbing her repeatedly in the back (at least seven hours after satisfying himself of her infidelity) he was angry

---

[3] In an oral statement to the police, the defendant said he told his wife, "If he is a nice guy, go for it." In response, his wife told him that she was not really looking for another man, and did not want a new relationship until she had had the opportunity to establish herself in her own apartment. This conversation stands in contrast to one described in the case of *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984), in which the victim taunted the defendant with her infidelity.

with her "because she had been lying to [him]." After the killing, he returned to his bed "and tried to relax."[4] There was a dearth of evidence tending to show that the defendant had lost control of himself on the night of the killing and acted in the heat of passion rather than after a period of brooding and reflection. See *Commonwealth* v. *McLeod, supra* (jury must be able to infer that "in fact [the] defendant was provoked and did not cool off").

In considering the probable effect on the jury of the improper evidence, we rely primarily on the flimsiness of the case for voluntary manslaughter. We also attach some significance to a lengthy curative instruction given as part of the judge's final charge to the jury, in which he directed the jury to disregard testimony about what the victim had said in the past to various family members about the defendant's conduct.[5] While we harbor some doubt of the complete efficacy of a curative instruction striking portions of testimony heard by the jury three or four days earlier, see *Commonwealth* v. *Hoppin*, 387 Mass. 25, 31 (1982); contrast *Commonwealth* v. *Martino*, 412 Mass. 267, 281-282 & n.10 (1992); *Commonwealth* v. *Robertson*, 408 Mass. 747, 752-753 (1990), we note, nonetheless, that the judge described quite specifically the testimony that the jury should disregard, and we assume the jury made a conscientious effort to follow the judge's instruction. See *Commonwealth* v. *Walker*, 421 Mass. 90, 104 (1995). It seems likely, therefore, that, to the extent the jury might have considered the relationship between the victim and the defendant as bearing on the defendant's intent and state of mind on the night of the killing, they would have relied primarily on the abundant admissible evidence of threats and marital discord. We conclude that the error in

---

[4]A State trooper trained in the analysis of bloodstain evidence, called by the Commonwealth, testified that there were numerous small flakes of blood of the victim's blood type near the foot of the bed the defendant had been using, suggesting that he had gotten in bed with his feet covered in her dried blood.

[5]The judge instructed the jury that evidence of this sort was not considered reliable because it concerned statements of the defendant "not observed or heard by anyone who was available to testify at the trial" who could be cross-examined concerning the truth of the alleged statements. The judge also suggested that the truth of the statements might be doubted because in making them, the victim might have been motivated by guilt over her own conduct or a desire to enlist her family members on her side in her dispute with her husband.

admitting the hearsay evidence did not prejudice the defendant and does not constitute a basis for a new trial. See *Commonwealth* v. *Zagranski, supra* at 284.

2. In the second of his two statements to the police,[6] the defendant told the interrogating officers that the victim came into the room where he was sleeping around 6 A.M. on April 26, holding a knife. He then followed her into her bedroom, where she became violent, stabbing herself in the stomach. He wrestled with her, trying to gain possession of the knife, and in the process pushed her out into the hallway and toward the bathroom. She swiped at him with the knife with one hand, while fending him off with the other, and again stabbed herself, this time in the chest and the head. She fell on her knees in the bathroom. He "finish[ed] her off" by stabbing her three times in the back. Questioned about this last statement, he agreed that he might have stabbed her more than three times.

The victim suffered forty-two stab wounds and three cuts, or incised wounds.[7] She had possible defensive wounds to her hands and legs. There was no stab wound to the abdominal area. The majority of the stab wounds were to the victim's back. In varying amounts, blood was found in every room of the apartment. The Commonwealth's theory of the case was that the defendant had entered the victim's bedroom and stabbed her while she was in bed, and then, continuing to stab at her, pursued her out the door of this room, down the hall, through the kitchen and into the bathroom, where he finally "finish[ed] her off." In support of its theory, the Commonwealth offered two videotapes of the apartment, showing the trail of bloodstains between the victim's bedroom and the bathroom, with the body in situ.[8] In conjunction with the testimony of a State trooper trained in the analysis of bloodstains, the Commonwealth offered a total of fifty-one

[6]In his first statement to the police, the defendant asserted that the victim had committed suicide.

[7]The medical examiner explained that a stab wound is one that penetrates deeper into the body than it measures along the skin's surface. A cut, or incised wound, is longer on the skin surface than it is deep.

[8]The videotapes were entered in evidence and shown to the jury, but were not given to the jury with the other exhibits during their deliberations. At the judge's direction, when the second videotape was shown to the jury, the Commonwealth used the "fast-forward" feature at the end of the videotape to avoid an undue focus on the body of the victim.

photographs of the apartment, including close-up photographs of bloodstains, and two photographs of the victim's body. During the medical examiner's testimony, nine autopsy photographs were admitted in evidence.

The defendant objected that showing two videotapes was unnecessarily duplicative; he also objected to the admission of the autopsy photographs. On appeal, he argues that the judge abused his discretion by permitting both videotapes to be shown to the jury, and suggests the admission of numerous still photographs aggravated the prejudice caused by this error.

We have examined the photographs and videotapes at issue. The Commonwealth properly introduced a limited number of autopsy photographs, sufficient to demonstrate the extent of the victim's wounds, and probative on the point whether those injuries could have been self-inflicted, as well as on the question of extreme atrocity or cruelty. The first videotape was a fair depiction of the crime scene, see *Commonwealth* v. *Simmons*, 419 Mass. 426, 432 (1995); the second videotape showed the jury the layout of the apartment (no view was taken), so that they could follow the testimony of the State trooper as, relying on the bloodstains, he described the probable progression of the defendant's assault on the victim. Almost all of the still photographs, like the second videotape, focused primarily on the bloodstains. This evidence eloquently contradicted the defendant's version of events, and was probative on the points of manslaughter, premeditation, and extreme atrocity or cruelty.

We have recently cautioned that trial judges "must take care to avoid exposing the jury unnecessarily to material that might inflame the jurors' emotions and possibly deprive the defendant of an impartial jury." *Commonwealth* v. *Simmons*, *supra*. This case was tried five years before our admonition in the *Simmons* case. It is apparent from the transcript that the judge was sensitive to his obligation to avoid the admission of unnecessarily inflammatory material and took steps to meet this obligation. See note 8, *supra*. While we might not have reached the same decision on the question of showing of both videotapes of the apartment, we cannot say that the balance struck by the judge exceeded the limits of his discretion. See *Commonwealth* v. *Benson*, 419 Mass. 114, 118 (1994); *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990).

3. The remaining issues argued by the defendant do not require extensive discussion.

a. The judge's brief preliminary remark to the jury, to the effect that witnesses seldom lie, not objected to by the defendant, would have been better left unsaid, but could not have created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Hodson*, 33 Mass. App. Ct. 930, 931 (1992). The brief remark (much briefer than the remark made by the judge in the *Hodson* case), came at the outset of the trial as the judge explained to the jury their function as the finders of fact. We do not believe the jury would have connected it with the curative instruction, given three days later, suggesting that the victim had a motive for fabricating allegations of abuse.

b. In some respects, the prosecutor's closing argument improperly appealed to the jury's emotions and sympathies.[9] See *Commonwealth* v. *Walker*, 421 Mass. 90, 103 (1995); *Commonwealth* v. *Graziano*, 368 Mass. 325, 332 (1975). The defendant's trial counsel did not object to the argument, which, until its concluding peroration, was, for the most part, a fairly reasoned discourse on the evidence heard by the jury. The judge instructed the jury to decide the case on the basis of the evidence, and to be fair and impartial. They were told that the arguments of the attorneys were not evidence, and that the defendant was to be presumed innocent until proved guilty beyond a reasonable doubt. Viewing the prosecutor's closing argument in the context of the entire trial, and the judge's instructions, we conclude that flaws in that argument did not give rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Mello*, 420 Mass. 375, 379-381 (1995); *Commonwealth* v. *Marquetty*, 416 Mass. 445, 449-452 (1993).

---

[9]At the close of her argument, the prosecutor "suggested" to the jury that the evidence in the case "crie[d] out for justice," and asked the jury to "do justice." These comments should not have been made. We do not consider improper the use of the words "blood bath," to describe the bathroom where the victim was found. The prosecutor was arguing, from the evidence, that the defendant likely had suffered the cuts to his hands when they slipped on the knife, which must have been, like the rest of the room, covered in blood. Other complaints made by the defendant about the prosecutor's closing argument fall into the same category. We assume that the jury have a sufficient measure of sophistication to screen out a degree of hyperbole. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 451 (1993).

c. Finally, the defendant argues that certain omissions from the judge's charge, to which there also was no objection at trial, constitute reversible error. We disagree.

The judge instructed the jury that if the defendant used excessive force in defending himself against an assault by the victim, he would be guilty only of voluntary manslaughter. The defendant complains that the judge failed to instruct the jury that "perfect self defense is a complete defense to the charge [of murder]." On no view of the evidence would the defendant have been entitled to a verdict of not guilty on the ground of self-defense. He admitted to "finish[ing] [the victim] off" by stabbing her in the back while she lay bleeding on the floor of the bathroom. A judge does not err by failing to instruct on a theory which has no basis in evidence. See *Commonwealth* v. *Carrion*, 407 Mass. 263, 268 (1990).

The defendant also complains of the judge's failure to instruct the jury that, "in considering the third prong of malice, [they] should consider any effects of the defendant's consumption of alcohol on the state of mind required under the third prong of malice." *Commonwealth* v. *Sires*, 413 Mass. 292, 298 (1992). We said in the case of *Commonwealth* v. *Sama*, 411 Mass. 293 (1991), decided after the defendant's 1990 trial,[10] that a defendant's intoxication "bears on the defendant's ability to possess the requisite knowledge of the circumstances in which he acted," *id.* at 298, and is relevant, therefore, to whether "the Commonwealth has proved the knowledge aspect of malice aforethought under the third prong." *Id.*[11]

Here, while there was evidence of the consumption of

---

[10]On the view we take of the evidence in this case, we need not decide whether the decision in *"Commonwealth* v. *Sama,* 411 Mass. 293 (1991), is to be applied prospectively to cases tried after the date of that decision or whether it applies to cases pending on appeal." *Commonwealth* v. *Judge,* 420 Mass. 433, 436 n.2 (1995).

[11]The defendant claims that the judge erred by giving a definition of malice that failed to inform the jury of its subjective component. It is true that at one point in his charge to the jury, the judge gave a shorthand definition of the third prong of malice that lacked a reference to its subjective component, but he had previously given a full and appropriate definition of the third prong of malice, and the shortened definition was given when he referred the jury back to the instruction he had previously given. The judge's instructions on malice were not a model of clarity, but, viewed as a whole, the instructions adequately informed the jury of the elements they must consider in reaching a verdict on the charges against the defendant.

alcohol, there was no evidence of debilitating intoxication that would have hindered the defendant from comprehending that he was stabbing the victim. Contrast *id.* at 299. In the defendant's statements to the police, he never suggested that his ability to perceive and comprehend his circumstances was impaired by alcohol when he stabbed the victim. There was no evidence that he had consumed a large amount of alcohol that night, and there was evidence that at least some of his consumption of alcohol took place after the victim had been killed.[12] On the state of the evidence, we are satisfied the lack of an instruction in accord with the decision in *Sama* could not have affected the verdict reached by the jury.

4. The defendant seeks a new trial pursuant to G. L. c. 278, § 33E. After reviewing the record as a whole, we conclude that no new trial is required. The defendant deliberately and brutally murdered his wife. The interests of justice do not require a new trial.

*Judgment affirmed.*

O'CONNOR, J. (dissenting, with whom Liacos, C.J., joins). To obtain a conviction of murder, the Commonwealth was required to prove beyond a reasonable doubt that the defendant's killing of his wife was not voluntary manslaughter. This is so because, as the court recognizes, the evidence warranted a finding of voluntary manslaughter; that is, there was "evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and . . . the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Ante* at 237, quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984).

The jury heard the testimony of several witnesses. The testimony of five of those witnesses was erroneously admitted over the defendant's objection. Those witnesses testified that in the weeks before her death the victim had told them that the defendant had threatened and beaten her. Following the judge's final charge to the jury, in which for the first time he

---

[12]A partially empty bottle of blackberry brandy found in the apartment had bloodstains on its cap. These stains contained type A blood and type B blood (the victim's blood type).

instructed the jurors to disregard that testimony, the jury returned a verdict of guilty of murder. Presumably, the jury were satisfied beyond a reasonable doubt that the killing was not the product of a sudden loss of self-control in the heat of passion provoked by the defendant's confirmation of his earlier suspicion of his wife's (the victim's) infidelity. The critical question is whether the erroneous admission of that testimony might have influenced the jury's decision. Unless the court can rightly say that no such possibility exists, we cannot be confident that the defendant had a fair trial, and the conviction of murder must be reversed.

In order to reach the right answer to that critical question, it is necessary to focus on the standard, which this court has previously established, by which the effect of the erroneous admission of the five witnesses' hearsay testimony must be measured. "Because the error here was not a constitutional one, our inquiry is whether the improper admission of the evidence constituted prejudicial error. See *Commonwealth* v. *Schulze,* 389 Mass. 735, 741 (1983). Under this standard we consider whether 'the error possibly weakened [the defendant's] case in some significant way so as to require a new trial.' *Id.*" *Commonwealth* v. *Daggett,* 416 Mass. 347, 352 n.5 (1993). The ultimate question is whether the court can fairly say "that the jury could not have been influenced by [the erroneously admitted evidence]." *Commonwealth* v. *Stone,* 321 Mass. 471, 474 (1947). See *Commonwealth* v. *Welcome,* 348 Mass. 68, 70 (1964) ("It is very possible that the finding made by the judge was not at all affected by what he [improperly] heard of the defendant's previous difficulties. We can only speculate upon the effect of that evidence. We are not in a position to say that it had none and such doubts as we entertain can only be resolved in favor of the defendant. *Commonwealth* v. *Stone,* 321 Mass. 471"). It is inappropriate, therefore, for the court to consider "the probable effect on the jury of the improper evidence," *ante* at 241, or to consider whether "[i]t seems likely . . . [that the jury] would have relied primarily on the abundant admissible evidence of threats and marital discord," *ante* at 241. Instead, the court's concentration should be on the question whether the jury could have been — might have been — influenced by the inadmissible hearsay evidence of the defendant's assaultive behavior toward the victim over a several week period before

the killing. Did the error possibly weaken the defendant's case in some significant way? I think it did. Is the court in a position to say that the inadmissible hearsay evidence had no effect on the verdict? I think not.

As the court states, *ante* at 239, "the Commonwealth's case contained compelling admissible evidence of considerable marital discord" evidenced, in part at least, by loud arguments between the victim and the defendant. Such discord says little, if anything, about whether the killing was the result of the defendant's sudden loss of control provoked by his confirmation of the victim's unfaithfulness. Furthermore, did the jury believe the testimony that the defendant had expressed an intent to kill his wife and himself? Did they believe the testimony that (1) the defendant had driven his automobile into the victim's automobile with enough force to break a taillight, and (2) had "attempted" to hit the victim? If they did believe it, did they attach importance to it, or did they simply focus on the inadmissible hearsay? Of course, it is possible that the jury believed that testimony and without reference to the inadmissible hearsay concluded that the killing was not manslaughter but was murder. It is also possible, however, that, because of disbelief of at least some of that testimony or because of doubt about what it proved relative to whether the killing was manslaughter or murder, the jury concluded beyond a reasonable doubt that it was murder only by taking into account the testimony of the five witnesses relative to threats and beatings over an extended period of time. That testimony, inadmissible as it was, strongly tended to show that the killing was other than a sudden impulsive reaction to a recent provocation. Despite the judge's instructions, the jury may have relied on it to reach their verdict. Not only the court, but I, too, "harbor some doubt of the complete efficacy of a curative instruction striking portions of testimony heard by the jury three or four days earlier." *Ante* at 241. Whether the verdict in this case was influenced by inadmissible hearsay evidence is a matter of doubt. That doubt should be resolved in the defendant's favor. "Whether guilty or innocent, he was entitled to be tried in accordance with law." *Commonwealth* v. *Stone, supra* at 474.