SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. CHRISTOPHER S. FRATANTONIO

 
 Docket:
 SJC-12685
 
 
 Dates:
 December 2, 2024 – March 17, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Dewar, & Wolohojian, JJ.
 
 
 County:
 Barnstable
 

 
 Keywords:
 Homicide. Practice, Criminal, Assistance of counsel, Witness, Capital case. Constitutional Law, Assistance of counsel. Evidence, Expert opinion. Witness, Expert. Mental Impairment.
 
 

  
      Indictment found and returned in the Superior Court Department on March 31, 2017.
      The case was tried before Gary A. Nickerson, J., and a motion for a new trial, filed on February 23, 2021, was heard by Gregg J. Pasquale, J.
      Theodore F. Riordan (Deborah Bates Riordan also present) for the defendant.
      Marina Moriarty, Special Assistant District Attorney, for the Commonwealth.
      DEWAR, J.  A jury convicted the defendant, Christopher S. Fratantonio, of murder in the first degree for the killing of his wife, Mary Fratantonio, known as Molly.  Hours after he discovered on his wife's cell phone text messages exchanged with another man, the defendant stabbed her to death.  Trial counsel pursued a mental impairment defense based on evidence that included the opinion of an expert forensic psychiatrist.
      Before this court are the defendant's appeals from his conviction and from an order denying his motion for a new trial.  In that motion, the defendant contended that his trial counsel rendered ineffective assistance in failing to pursue an additional defense of heat of passion on reasonable provocation and in failing adequately to prepare the defendant's expert witness.  The motion judge rejected those claims, holding that counsel's strategic decision to focus on the mental impairment defense was not manifestly unreasonable in the circumstances of this case, and that any prejudice caused by the expert's answer to one question for which he was not prepared was mitigated by the expert's subsequent testimony clarifying his answer.
      We conclude that the motion judge did not abuse his discretion in denying the defendant's motion for a new trial.  On review of the entire record of this case under G. L. c. 278, § 33E, we affirm the defendant's conviction and decline his request that we reduce the conviction to manslaughter or order a new trial.
      1.  Background.  a.  Commonwealth's case.  We summarize the facts that the jury could have found, reserving certain details for our discussion of the issues.  It was not disputed that the defendant killed the victim, and the Commonwealth's evidence included two videotaped confessions in which the defendant described in detail the events preceding the killing and the killing itself.
      At the time of the killing, the defendant and the victim had been married for ten years and had two young children.  The defendant also has two older daughters from previous relationships.
      The relationship between the defendant and the victim was rife with conflict in the months before the slaying in the early hours of February 28, 2017.  The record includes thousands of text messages they exchanged on their cell phones during the prior three months.  Amidst exchanges regarding childcare, grocery shopping, and the like, these messages contain extensive discussions concerning the couple's relationship and financial troubles, as well as exchanges reflecting the vicissitudes of the victim's addiction to prescription opioid drugs.  The victim repeatedly communicated to the defendant that she wanted to divorce him and wanted him to move out of the family home, and the defendant made repeated efforts to convince her not to end the marriage or at least to remain open to the idea of an eventual reunion.
      Among the topics discussed by the couple in the weeks preceding the killing was the victim's reacquaintance with a man whom she had briefly dated while she lived in Texas prior to her relationship with the defendant.  Months before the killing, the victim had received a "friend" request on a social media account from the Texas man.  The defendant expressed to the victim his view that it was a bad idea for her to accept the request, and she told the defendant she had not done so.  Three weeks before the killing, the defendant discovered that the victim and the Texas man had been in contact via e-mail.  The victim assured the defendant that the two exchanged only infrequent and innocuous messages.  Days before the killing, the defendant called the Texas man and conveyed his suspicions that the man was having an affair with the victim, and the man responded that he and the victim were only friends.
      The defendant had also made comments to four people referencing the idea of killing his wife.  The defendant had told his employer that he was having marital problems and stated at one point that he was "going to kill her"; at the time, the employer interpreted the statement as an "off-the-cuff" remark, discounted it as "blowing off steam," and offered the defendant a place to stay for one or two months if needed.  Several weeks before the killing, the defendant sent a friend a text message:  "I was up at 3 A.M. the other morning thinking if I went upstairs and killed her and went to jail I'd still feel better than I do."  After the friend suggested spending a week apart, the defendant replied, "Ugh.  Molly gone wild.  Ugh.  She needs a pillow over the head, not a free week."  Two weeks before the killing, the defendant told his brother that he suspected the victim was having an affair and said, "I'm going to end up killing her at the rate it's going."  And, during a telephone call with the victim's stepfather at about 5:30 P.M. on February 27, when the stepfather told the defendant that if he kept supplying the victim with drugs "she could die," the defendant responded, "Well, that's one solution."
      During the evening of February 27, the couple's daughter hugged the defendant and said she did not want him to "leave."  She then explained that her mother had been "texting someone" that "hopefully" the defendant would "leave[] . . .  and stay[] out for good."  In response, the defendant asked the daughter to retrieve the victim's cell phone and unlock it because he did not know the password.
      Once he obtained access to the victim's cell phone, the defendant read text messages between the victim and the Texas man.  The victim's messages to the Texas man evinced contempt for the defendant, described various bad acts by the defendant during the course of their marriage, and discussed steps she was taking to obtain a divorce from him, including "try[ing] to be as nice as I can . . . so he doesn't change his mind about agreeing to things like the house etc."  The messages between the victim and the Texas man also evinced mutual admiration and enthusiasm for a romantic relationship between them and discussed the prospect of the victim visiting the man in Texas during the coming summer.
      The defendant took screenshots[1] of some of the text messages between the victim and the Texas man and sent them to his own cell phone at 8:36 P.M.  The defendant then went upstairs, told the victim that he had read the messages, returned downstairs, and exchanged further text messages with her starting at 8:50 P.M.  The victim sent the defendant numerous angry messages castigating him for the invasion of privacy, telling him she hated him, and asking him when he would be moving out.  In the last messages the defendant sent to the victim, over the span of 9:57 P.M. to 10 P.M., he responded to questions from her by denying that he was "plan[ning] on fighting [her] in court"; affirming that he would move out of the house; and, describing her as "still my friend" and "still family," stating that he would "rather stuff go smooth and save any friendship we can."  The victim's last text messages to the defendant -- responding that she hoped he could "get some help so [his] next relationship doesn't end this way" and informing him that she was "unfriend[ing]" a person on social media to prevent that person from "investigat[ing]" her for the defendant -- were sent at 10:14 P.M and 10:16 P.M.
      Over the course of the evening, the defendant reread the text messages between the victim and the Texas man for hours.  At one point he picked up a knife from the butcher block in their kitchen, thinking that he might kill the victim.  Instead, he put down the knife and went outside to smoke a cigarette and, in his words, "tried to calm down."  He also called a friend "to see if . . . [he] could talk [him]self out of it."  By that friend's account, the substance of their conversation was that the defendant "had read some messages from [the victim's cell] phone," "was getting kicked out," and "basically wanted to move on."  After the call, the defendant and the friend exchanged text messages, concluding with a message in which the friend expressed that it was "time to move on."
      Eventually, at approximately 1:20 A.M., the defendant again picked up the knife and went upstairs.  The victim was sleeping in bed beside their two year old son, with their six year old daughter asleep in her own bed at the foot of the couple's bed.  Before he stabbed the victim, the defendant thought, "If I don't do it, I mean, she's calling the cops.  Or I'm in trouble."  The defendant then stabbed the victim approximately twenty times and left the knife sticking out of her throat.  The victim's wounds included defensive injuries on her arms.
      After killing the victim, the defendant took the children downstairs and made a pot of coffee.  He sent text messages to, and tried to call, various people.  The defendant spoke with the friend whom he had called earlier in the evening, told her he needed her to come to his house because he had killed his wife, and also sent her via text message a photograph of the wife's body.  The friend called the police.  The defendant also spoke with his former employer and asked him to come to the house because he needed someone to watch the children while he went to the police station to report that he had killed his wife.
      When police arrived at the defendant's house, they observed the defendant come out the front door holding a coffee cup.  The defendant told the police his name, said that he just killed his wife, and, without prompting, put his hands behind his back as if to be handcuffed.  Following his arrest, the defendant waived his Miranda rights, gave police the two videotaped confessions, and consented to a search of his cell phone.
      b.  Defense at trial.  Trial counsel pursued a mental impairment defense.[2]  She retained an expert in forensic psychiatry to testify.
      After examining the defendant and ascertaining his medical history, the expert testified at trial that the defendant suffered from a mental impairment at the time of the killing.  In the expert's opinion, at the time of the killing, the defendant met the criteria for diagnoses of major depressive disorder, generalized anxiety disorder, and dependent personality disorder.  The defendant had received treatment for depression and anxiety when he was a teenager and again was receiving medications for both depression and anxiety in the years leading up to the killing.  One of his medications had been abruptly stopped the October prior to the killing, contrary to warnings for that medication recommending tapering, and it was replaced with a new medication; his dosage of the new medication had been increased about five weeks prior to the killing to try to alleviate his anxiety; and he had abruptly stopped taking the new medication about two weeks prior to the killing, again contrary to recommended practice.  The expert also testified about the defendant's history of posttraumatic stress disorder related to childhood sexual and physical abuse and his reported continuing residual effects in the form of feelings of hypervigilance, hyperarousal, and being on edge; a traumatic brain injury the defendant sustained as a teenager that had left him color-blind; and the stress on the defendant caused by living under the threat of divorce amidst his "co-dependent" relationship with the victim and his dependent personality disorder.  The expert testified that the defendant was unable to engage in "any sort of reflection or deliberation or premeditation on what he was doing" because, "on top of having mental disorders," he "was so distraught and so upset and so shocked, in addition to having the biological effects of coming off the antidepressant."  The killing was, in the expert's opinion, "a very emotional, primitive," and "reflexive" act.
      A psychiatrist testified for the Commonwealth in rebuttal.  Based on the psychiatrist's examination of the defendant, the defendant's medical records, his videotaped confessions, and other materials in the case, the psychiatrist opined that, at the time of the killing, the defendant did not have a mental disease that deprived him of the ability to deliberately premeditate the killing or specifically intend his actions.
      c.  Prior proceedings.  On March 31, 2017, a grand jury indicted the defendant for murder in the first degree.[3]  The jury trial began on June 4, 2018, and concluded on June 8, 2018.  The Commonwealth proceeded at trial on theories of murder committed with deliberate premeditation and extreme atrocity or cruelty.  At the charge conference, the defendant requested jury instructions on mental impairment and manslaughter.  The judge agreed to instruct the jury on mental impairment and stated that he would also, "in an abundance of caution," instruct the jury on voluntary manslaughter as a result of heat of passion on reasonable provocation.  The jury found the defendant guilty of murder in the first degree on both theories.  The defendant was sentenced to life in prison without the possibility of parole.
      The defendant's direct appeal from his conviction was stayed while he filed a motion for a new trial.  In the motion, the defendant claimed ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  He argued that trial counsel should have pursued a heat of passion defense in addition to the mental impairment defense at trial, and that trial counsel did not adequately prepare the defense expert, causing the expert to make a damaging concession.
      The motion judge, who was not the trial judge, held a two-day evidentiary hearing at which the defendant, his trial counsel, and the defense expert testified.  The judge denied the defendant's motion for a new trial on September 23, 2022.  The defendant's appeal from that order was consolidated with his direct appeal, and both are now before this court.
      2.  Discussion.  Under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a judge may allow a motion for a new trial "if it appears that justice may not have been done."  Where, as here, a defendant's direct appeal from a conviction of murder in the first degree has been consolidated with his appeal from the denial of a motion for a new trial, this court reviews both under G. L. c. 278, § 33E.  Commonwealth v. Vargas, 475 Mass. 338, 354 (2016).  Accordingly, we review the motion judge's order denying a new trial to determine whether there has been a significant error of law or other abuse of discretion, and, if so, whether the error creates a substantial likelihood of a miscarriage of justice.  Id. at 355.  We accept the motion judge's factual findings following the evidentiary hearing on the motion for a new trial if supported by substantial evidence; defer to the motion judge's assessment of the credibility of witnesses who testified at the hearing; and, because the motion judge was not the trial judge, regard ourselves in as good a position as the motion judge to assess the trial record.  Commonwealth v. Velez, 487 Mass. 533, 540-541 (2021).  In reviewing the defendant's claims of ineffective assistance of counsel under G. L. c. 278, § 33E, we consider "whether defense counsel erred during trial and, if so, 'whether that error was likely to have influenced the jury's conclusion.'"  Commonwealth v. Ng, 489 Mass. 242, 249 (2022), S.C., 493 Mass. 247 (2023), quoting Commonwealth v. Seino, 479 Mass. 463, 472-473 (2018).
      a.  Heat of passion defense.  We first address the defendant's claim that his trial counsel's failure to pursue a defense of heat of passion on reasonable provocation deprived him of his Federal and State rights to effective assistance of counsel.  In support of this claim, the defendant points to text messages between the victim and himself demonstrating, he contends, that she deceived him into believing they were still in love and working on their marriage, notwithstanding their troubles and discussions of divorce.  The defendant argues that his discovery of the text messages between the victim and the man in Texas, together with inflammatory text messages the victim then sent to the defendant after he told her that he knew of her deception, constituted reasonable provocation because, as the defendant testified at the hearing on the motion for a new trial, the messages suddenly revealed that the couple's ten-year relationship "was a lie" and "that she was invested in someone else."  Moreover, the defendant contends, the heat of passion defense would not have been inconsistent with, and could have buttressed, his defense of mental impairment.  Indeed, he notes, the defense expert who testified at trial had opined in his pretrial report that his examination of the defendant led him to believe that the defendant was acting under a "'heat of passion[]' that was brought on by reasonable provocation" and that the defendant had not "cooled off" by the time of the killing, and the expert reaffirmed these opinions at the hearing on the motion for a new trial.
      Because it is not disputed that trial counsel made a strategic decision not to pursue the heat of passion defense, we apply to this claim of ineffective assistance of counsel "the more rigorous standard that, to be ineffective, the attorney's decision must have been manifestly unreasonable when made."  Velez, 487 Mass. at 540.  Applying this standard, "we evaluate the [strategic or tactical] decision at the time it was made, and make every effort  . . . to eliminate the distorting effects of hindsight."  Id., quoting Commonwealth v. Holland, 476 Mass. 801, 812 (2017).  "Only strategy and tactics which lawyers of ordinary training and skill in criminal law would not consider competent" are manifestly unreasonable.  Velez, supra, quoting Holland, supra.
      If successful, the defense of heat of passion induced by reasonable provocation reduces a defendant's conviction to voluntary manslaughter, an "unlawful homicide arising not from malice, but 'from the frailty of human nature.'"  Commonwealth v. Bins, 465 Mass. 348, 368-369 (2013), quoting Commonwealth v. Carrion, 407 Mass. 263, 267 (1990).  Reasonable provocation "is provocation that 'would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint.'"  Bins, supra at 369, quoting Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006).  To obtain an instruction on this defense, "[t]he evidence must be sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable.  That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off."  Commonwealth v. Groome, 435 Mass. 201, 220 (2001), quoting Commonwealth v. McLeod, 394 Mass. 727, 738, cert. denied sub nom. Aiello v. Massachusetts, 474 U.S. 919 (1985).
      "Ordinarily, words alone do not give rise to adequate provocation."  Groome, 435 Mass. at 220.  "However, 'in certain circumstances, words may convey information constituting adequate provocation to render an unlawful killing voluntary manslaughter.'"  Id., quoting Commonwealth v. Benjamin, 430 Mass. 673, 680 (2000).  This "very limited exception" applies only "where the statements constitute a 'peculiarly immediate and intense offense to [one's] sensitivities.'"  Groome, supra at 221, quoting Benjamin, supra.
      Applying these principles in the context of marital infidelity, under the law applicable at the time of the defendant's trial, a defendant could pursue this defense based on evidence of a "sudden discovery of present spousal infidelity," Commonwealth v. Andrade, 422 Mass. 236, 237-238 (1996), citing Commonwealth v. Bermudez, 370 Mass. 438, 440-442 (1976), including discovery by means of a sudden oral admission of adultery, see Commonwealth v. Schnopps, 383 Mass. 178, 181 (1981).[4]  As with other claims of reasonable provocation, however, this defense was available only where "the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool."  Id. at 180.
      Here, while trial counsel researched and repeatedly discussed the heat of passion defense with both the defense expert and the defendant, she made a strategic decision not to pursue the defense at trial because she "didn't think it was credible to suggest" and did not "want to lose the jury entirely."  In her view, the evidence did not support this defense because of the hours-long interval after the defendant's discovery of the victim's text messages with the Texas man and after the ensuing text messages between the victim and the defendant concluding at 10:16 P.M, before the defendant killed the victim approximately three hours later.  Instead, the mental impairment defense "appeared to be the most credible" and would focus on the defendant's "mental state and the various things that he had been through in his life and how that impacted him on the night in question," rather than the "horrific" details of the killing.
      We discern no abuse of discretion in the motion judge's conclusion that trial counsel's strategic decision not to pursue a heat of passion defense was not manifestly unreasonable in the circumstances of this case.  To begin, even assuming the defense was available to the defendant here as a matter of law,[5] and even viewing the evidence in the light most favorable to the defendant, the defense was at best extremely weak.  Considerable evidence contradicted any argument that the text messages the defendant read on the night of the slaying contained a "sudden" revelation, Andrade, 422 Mass. at 237, and that "in fact" it was this sudden revelation that provoked the defendant to kill the victim (citation omitted), Groome, 435 Mass. at 220.  See Bins, 465 Mass. at 369-370 ("sudden passion" defense foreclosed where "deterioration of the defendant's marriage, as well as the other background factors fueling the defendant's frustration, began well before the killings and occurred over an extended period of time" prior to "heated verbal argument" that led to killings).  The couple's text messages, the defendant's own statements to the police, and testimony from their family and friends provided overwhelming evidence that the couple's relationship had been deteriorating for weeks before the night of the killing, and that the defendant had already learned that, in the defendant's own words in a text message weeks before the killing, the victim "want[ed] a divorce for real."  Although, as the defendant emphasizes, the victim at times had made conciliatory statements to him leaving open the possibility of reconciling in the future, she also repeatedly had expressed to him an unequivocal wish to divorce, discussed with him concrete steps toward that end, and harshly criticized both him and their marriage.  Moreover, even prior to reading the victim's messages with the Texas man, the defendant's suspicions regarding this man were such that, several days prior to the killing, he had called the man to confront him, and the defendant had already told his employer that the victim was "cheating" on him.  And, as described above, the evidence included four different statements made by the defendant prior to the killing that expressly referred to the idea of killing the victim, albeit in a manner perceived by one person as just "blowing off steam."
      Yet worse for this defense's prospects was the evidence concerning whether a reasonable person would have "cooled off" from the provocation by the time of the killing, and whether in fact the defendant did cool off (citation omitted).  Groome, 435 Mass. at 220.  See Commonwealth v. Keohane, 444 Mass. 563, 568-569 (2005), quoting Commonwealth v. Fuller, 421 Mass. 400, 413 (1995) (holding defense unavailable where defendant's activities after alleged provocation and before killing showed he "was not acting from 'a sudden transport of passion,' but rather from an anger that was 'smoldering'").  Hours passed between when the defendant first read the text messages and the killing.  While the defendant's expert would have opined that the defendant did not cool off because of his continual rereading of the text messages during those hours, it was undisputed that the defendant, in his final text messages to the victim, stated that he would accept the divorce and wished to retain an amicable relationship; picked up a knife but then set it down; went outside and had a cigarette to calm himself; spoke and exchanged text messages with a friend, who urged him that it was time to move on from the relationship; and, just before killing the victim, thought to himself, in his words, "I'm already up here.  I already have a knife.  If I don't do it, . . . she's calling the cops.  Or I'm in trouble."  These intervening events would have weighed heavily in a jury's assessment whether a reasonable person in the defendant's circumstances would have "cooled off" from any provocation caused by reading the text messages, and whether the defendant actually did "cool off" and acted "after a period of brooding and reflection" rather than in the heat of passion.  Andrade, 422 Mass. at 241.
      For these reasons, we agree with the motion judge that trial counsel's judgment that the heat of passion defense "bore little chance of success" was not manifestly unreasonable.  Moreover, as the motion judge also determined, the reasonableness of counsel's strategic decision not to pursue the heat of passion defense was further supported by the fact that the defendant had an alternate defense -- not subject to the same flaws as the heat of passion defense -- for which counsel wished to preserve the defense's credibility with the jury.  The mental impairment defense was based on expert testimony drawing on the expert's three diagnoses of the defendant, including a dependent personality disorder that, the expert opined, bore directly on the defendant's troubled relationship with the victim; the defendant's history of anxiety and depression, as well as posttraumatic stress disorder and traumatic brain injuries; and the defendant's recent abrupt cessation of one of his medications.  While the heat of passion defense was not inherently inconsistent with the mental impairment defense, we have recognized that "[c]ounsel is not required to raise every conceivable defense," Commonwealth v. Montez, 450 Mass. 736, 759 (2008), and, in particular, is not required to "rid[e] 'two horses'" and pursue a defense posing "extreme difficulty," where the defendant has a "viable alternative defense," Commonwealth v. Kolenovic, 471 Mass. 664, 675-676 (2015), S.C., 478 Mass. 189 (2017).  Rather, "[e]ven compatible defenses may dilute each other, and counsel may decide reasonably to proceed with only one."  Montez, supra.  Such was the nature of counsel's strategic decision here.  "Although trial counsel's strategic choice failed to yield a favorable disposition for the defendant, nevertheless, we cannot conclude that it was manifestly unreasonable . . . ."  Holland, 476 Mass. at 813.
      Nor was trial counsel's strategic choice to pursue the mental impairment defense to the exclusion of the heat of passion defense manifestly unreasonable with respect to counsel's closing argument in particular.  See Commonwealth v. Dinkins, 440 Mass. 715, 722 (2004) ("In deciding what to highlight during closing argument, counsel inevitably [has] to make strategic choices with regard to emphasis and importance . . .").  The defendant argues that it was constitutionally ineffective not to argue the defense in closing, because evidence supported the defense and the trial judge had told counsel at the charge conference that he would instruct the jury on it; the judge stated that, although he would not view the defense as "viable" if he were the fact finder, in his view there was "some possible combination of determinations by the jury as to what they credit and what they do not credit that could lead to voluntary manslaughter."  While this ruling obviated counsel's concern before trial that the defense was so weak as to be potentially held by the judge to be foreclosed by law, counsel's strategic decision was also, as discussed, based on a concern that such a weak defense lacked credibility and risked alienating the jury, thereby detracting from the relatively stronger mental impairment defense.  Those strategic considerations were not disturbed by the judge's choice to instruct on the heat of passion defense "in an abundance of caution."  Contrast Commonwealth v. Westmoreland, 388 Mass. 269, 271-274 (1983) (ineffective assistance of counsel found where counsel presented evidence supporting three defenses but abandoned two of them in closing, arguing only weakest one).  Moreover, by the time of the closing arguments, trial counsel had presented expert testimony tailored to the mental impairment defense, without doing the same for the heat of passion defense.  We agree with the motion judge that, after counsel had implemented at trial the strategic decision, not manifestly unreasonable, to pursue only the mental impairment defense, it also was not manifestly unreasonable for counsel to forgo arguing the heat of passion defense in closing, when that defense was weaker yet.  See Commonwealth v. Denis, 442 Mass. 617, 627 n.7 (2004).
      b.  Preparation of expert witness.  The defendant also argues that trial counsel provided ineffective assistance by failing to prepare adequately the defense's expert witness, causing the expert to provide damaging testimony at trial.
      The defendant's argument is based on one answer by the expert.  As part of trial counsel's preparation of the defense's expert witness, counsel gave the expert a list of questions she planned to ask at trial.  The list did not include the following question, however, which counsel posed to the expert at trial, prompting an answer the defendant contends damaged his defense: 
Q.:  "[D]o you have an opinion about whether or not [the defendant] had the ability to intend to cause grievous bodily harm on [the victim]?"
A.:  "That's -- okay.  So that's a legal term, but he –- [a]t some level, yes, he was acting out anger in a destructive way to her, unquestionably."
The direct examination ended shortly thereafter.
      The prosecutor then revisited this exchange on cross-examination, asking whether he, the prosecutor, had "hear[d the expert witness] correctly" when trial counsel asked if the expert had an opinion as to whether the defendant was able to form the intent to cause grievous bodily harm, and the "answer was yes?"  The expert responded with confusion, leading the judge to intervene and define the term "grievous bodily harm" and the expert then to clarify his answer, stating:
A.:  "At some level, it would be on a very emotional level, he would be intending to do these -- a destructive action towards her, yes."
Q.:  "So he would have the intent to do grievous bodily harm?"
A.:  "I wouldn't call it intent.  He's acting on a very, very emotional, distraught level and I don't believe that he's reflecting on what exactly he's doing at the time, in the sense of an intent."
At the hearing on the motion for a new trial, the expert testified that he would have given his final answer to the question, denying that the defendant had the intent to do grievous bodily harm, as his first answer if he had been prepared by counsel to answer the question.
      The motion judge did not abuse his discretion in concluding that, while the expert's initial answer "did not help the defense," the expert's subsequent clarification during cross-examination was consistent with the rest of his testimony supporting the mental impairment defense and mitigated any prejudicial effect of his initial answer.  Indeed, the prosecutor did not probe this point further on cross-examination after the expert's final answer nor advert to the expert's initial answer in closing argument.  Even assuming trial counsel erred in failing sufficiently to prepare the expert (a question we need not reach), any such error did not create a substantial likelihood of a miscarriage of justice, because it would not have influenced the jury's conclusion.  See Ng, 489 Mass. at 249.[6]
      3.  G. L. c. 278, § 33E.  We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E.  We discern no basis to exercise our authority to reduce the verdict to manslaughter or grant a new trial.
      4.  Conclusion.  The motion judge did not abuse his discretion in denying the defendant's motion for a new trial.  Trial counsel's strategic decisions not to present a heat of passion defense at trial nor argue it in closing were not manifestly unreasonable, and any error by counsel in failing adequately to prepare the defense's expert witness did not create a substantial likelihood of a miscarriage of justice.  Following review of the whole record of the case under G. L. c. 278, § 33E, we affirm the judgment and the order denying the defendant's motion for a new trial.
                                          
 
So ordered.
footnotes

          [1] A screenshot is a "photograph or (now usually) a digital image of all or part of what is displayed at a given time on a screen" (citation omitted).  Commonwealth v. Troche, 493 Mass. 34, 35 n.3 (2023).
          [2] At trial and in the proceedings on the motion for a new trial, the defendant's mental impairment defense sometimes was referred to as "diminished capacity."  Massachusetts does not recognize a diminished capacity defense.  See Commonwealth v. Grey, 399 Mass. 469, 470 n.2 (1987).  Where, however, a crime has as an element that a defendant acted with a specific intent, a jury may consider a defendant's evidence of mental impairment in deciding whether the Commonwealth has proven that element beyond a reasonable doubt.  See id. at 470-471.
          [3] The grand jury also returned an indictment for assault and battery by means of a dangerous weapon, on which a nolle prosequi entered.
          [4] In Commonwealth v. Ronchi, 491 Mass. 284, 295 (2023), we held that, "[g]oing forward, we no longer will recognize that an oral discovery of infidelity satisfies the objective element of something that would provoke a reasonable person to kill his or her spouse."  We did not, however, "foreclose the possibility of sufficient provocation caused by learning of other types of information of a nature to cause a reasonable person to lose his [or her] self-control" (quotation and citation omitted).  Id.  Because this holding postdated the defendant's trial, we do not consider its application to the facts here.
          [5] We need not and do not express a view on this issue.
          [6] For similar reasons, there is no merit to the defendant's argument that the expert's initial answer to this question "imploded" the mental impairment defense, such that it amounted to ineffective assistance for trial counsel not to reconsider at that stage her strategic decision not to pursue a heat of passion defense in addition to the mental impairment defense.  No such "implosion" occurred.